[No. H030386. Sixth Dist. Jan. 17, 2008.]

RICHARD AMTOWER, Plaintiff and Appellant, v.
PHOTON DYNAMICS, INC., et al., Defendants and Respondents.

[No. H030477. Sixth Dist. Jan. 17, 2008.]

RICHARD AMTOWER, Plaintiff and Appellant, v.
PHOTON DYNAMICS, INC., et al., Defendants and Appellants.

## COUNSEL

The Elstead Law Firm, John Clifton Elstead; Esner, Chang & Ellis, Andrew N. Chang, Stuart B. Esner and Gregory R. Ellis for Plaintiff and Appellant.

Nossaman, Guthner, Knox & Elliott and Patrick J. Richard for Defendants and Respondents.

## OPINION

**PREMO, J.**—This action arises out of the merger of defendant Photon Dynamics, Inc. (Photon), with CR Technology, Inc. (CRT). Plaintiff Richard Amtower, formerly the president of CRT, alleged, among other things, that certain officers and directors of Photon violated section 11 of the federal Securities Act of 1933 (15 U.S.C. § 77k(a); hereafter section 11), breached their fiduciary duty, and misrepresented and concealed certain facts about the transferability of the stock Amtower acquired in connection with the merger. At the commencement of trial, the trial court granted an in limine motion to exclude all evidence pertaining to the section 11 claim on the ground that the claim was barred by the statute of limitations. The jury rejected plaintiff's remaining causes of action and plaintiff has appealed from the judgment.

Plaintiff maintains that the trial court's use of an in limine motion to adjudicate his section 11 claim deprived him of the right to a jury trial on the statute of limitations issue. Plaintiff's argument highlights a procedure that has become increasingly common among litigants in our trial courts, which is the use of in limine motions as substitutes for summary adjudication motions, motions for judgment on the pleadings, or other dispositive motions authorized by statute. We have certified this case for publication in order to express our concerns surrounding the proliferation of such shortcut procedures. The better practice in nearly every case is to afford the litigant the protections provided by trial or by the statutory processes. In the present case, however, although we would have preferred that the statute of limitations issue be decided by a proper summary adjudication motion or motion for nonsuit, the trial court's unorthodox procedure does not warrant reversal because plaintiff could not have prevailed under any circumstances. (Case No. H030386.)

In a separate case, plaintiff appeals from the trial court's postjudgment order awarding attorney fees to Photon. Photon has filed a cross-appeal in that case. (Case No. H030477.) We have ordered the two cases considered together for purposes of oral argument and decision and now affirm.

## I. Facts

In August 1999, the board of directors of CRT and the board of directors of Photon executed an agreement and plan of merger and reorganization (Merger Agreement). Under the Merger Agreement, which plaintiff negotiated and signed on behalf of CRT, Photon was to acquire CRT through a pooling of interests. Photon would trade 1.2033 shares of its stock for each share of CRT stock and CRT would become a wholly owned subsidiary of Photon.

One condition of the Merger Agreement was that CRT shareholders sign an agreement (the Affiliate Agreement) promising not to sell the Photon stock they acquired through the merger for 30 days following the merger. Plaintiff signed an Affiliate Agreement on his own behalf at the same time he signed the Merger Agreement on behalf of CRT. On October 27, 1999, as part of the merger transaction, Photon filed a form S-4 registration statement under the Securities Act of 1933 (the S-4 Statement), representing that "[Photon] common stock issued in connection with the merger will be freely transferable, except that shares issued to a CRT affiliate . . . are subject to certain restrictions on resale" as set forth in the Affiliate Agreement.

On November 19, 1999, plaintiff signed an employment agreement with Photon by which he agreed to continue as president of CRT for an annual salary of $180,000 and benefits, including options to purchase $80,000 shares of Photon stock options. Plaintiff alleged that he was induced to enter into

this agreement because of the salary, the stock options, and the expectation that he would be able to sell his Photon stock shortly after the merger. When the merger was complete on November 30, 1999, plaintiff received approximately 203,000 shares of Photon common stock, which were valued at approximately $25 per share at the time.

On December 13, 1999, plaintiff signed a "Lock-Up Agreement" by which he promised not to sell any of his Photon shares until 90 days after Photon filed a second registration statement with the Securities and Exchange Commission in mid-December 1999 in order to carry out a public offering of Photon stock.

Plaintiff claimed that by the time he signed the Lock-Up Agreement, his understanding was that the only restrictions upon the sale of his stock were the restrictions imposed by federal law and those contained in the Affiliate and Lock-Up agreements. The ability to sell the stock was important to plaintiff. He explained at trial that CRT had received an offer to purchase the company for cash but turned it down in favor of Photon's proposed transaction, based upon assurances that the CRT shareholders would be able to promptly and freely sell the Photon stock acquired in connection with the merger.

According to plaintiff, defendant Richard Dissly, Photon's chief financial officer, telephoned him after the merger was complete and told him, for the first time, that Photon had a policy that was designed to prevent officers and directors from selling Photon stock in violation of federal laws (Insider Trading Policy). Dissly explained that the policy created temporary quarterly blackout periods for selling stock and provided for a securities watch team, made up of Dissly and Photon's chief executive officer, defendant Vincent Sollitto. The securities watch team was charged with ensuring compliance with the policy. Insiders were to obtain permission from the securities watch team before selling any Photon stock. Dissly allegedly assured plaintiff that, notwithstanding the policy terms, which gave Dissly and Sollitto the power to prohibit a sale for "any reason," Amtower would be permitted to sell as much of his stock as he wanted as long as the sale did not take place during the specified blackout periods. Dissly said that plaintiff's employment by Photon was contingent upon his agreement to be bound by the policy. Allegedly relying upon Dissly's representations, plaintiff agreed.

In early May 2000, when the trading windows had opened under the Affiliate Agreement, the Lock-Up Agreement, and the Insider Trading Policy, and when the value of the stock had increased to over $70 per share, plaintiff claims that he asked the securities watch team for permission to sell all his stock but permission was denied. The securities watch team allowed him to

sell a small portion of his holdings (approximately 40,000 shares) but no more. Plaintiff later decided that he would rather be free to sell his stock than be an officer of Photon and, therefore, resigned on April 30, 2001, by which time the stock had dropped in value to less than $20 per share.

## II. PROCEDURAL BACKGROUND

Plaintiff sued Photon, Dissly and Sollitto, and Photon directors Francois Henley, Floyd Kvamme, Barry Cox, Michael Kim, and Malcolm Thompson, complaining that he had been misled about the transferability of Photon stock. He filed the initial complaint on April 30, 2001, alleging causes of action for breach of contract, breach of fiduciary duty, negligence, and several species of fraud. Plaintiff's first amended complaint filed on January 17, 2002, added a cause of action for violation of section 11. That cause of action alleged that the S-4 Statement contained omissions and misrepresentations in that it characterized the Photon stock as "freely transferable" and did not reveal the existence of the Insider Trading Policy that prohibited the sale of Photon stock during quarterly blackout periods and required prior approval from the securities watch team in order to sell at any other time.

On April 21, 2003, the superior court sustained a demurer, without leave to amend, to the causes of action for breach of contract and negligence. Remaining for trial were causes of action for breach of fiduciary duty, fraudulent inducement, fraudulent concealment, intentional misrepresentation, negligent misrepresentation, and the eighth cause of action for violation of section 11.

Trial commenced April 3, 2006. Defendants filed several motions in limine seeking to exclude or restrict plaintiff's evidence. One motion in limine requested an order excluding the testimony of plaintiff's expert witness, law professor Kenneth E. Scott, on the ground the testimony would consist solely of legal standards and conclusions. The trial court decided to limit Scott's opinion to whether Dissly had violated a duty of candor and good faith in his discussions with plaintiff.

Another motion in limine sought an order excluding evidence to support plaintiff's section 11 claim. In the alternative, defendants requested an Evidence Code section 402 hearing or a separate trial on their statute of limitations defense to the section 11 claim. The court chose to hold what it characterized as a "mini-trial." Evidence consisted of the pertinent documents and plaintiff's testimony concerning his discovery of the alleged omissions and misrepresentations in the S-4 Statement. Based upon the evidence presented, the court concluded that plaintiff's section 11 claim was barred by

the statute of limitations, as a matter of law, because plaintiff actually knew of the omissions and misrepresentations in the S-4 Statement as early as December 1999.

At the close of the evidence the trial court granted the motions for nonsuit made by the five Photon directors. By special verdict, the jury found that Sollitto and Dissly had not made any false representations or concealed material facts regarding the Insider Trading Policy and that neither had breached his fiduciary duty to plaintiff. The trial court entered judgment for defendants in the amount of $444,196.59, of which $380,604 reflected the trial court's determination of reasonable attorney fee allowed for defense of the section 11 and breach of contract causes of action. The court refused to award Photon fees for defense of the lawsuit as a whole, rejecting the argument that the Affiliate Agreement, which did not contain an attorney fees clause, actually incorporated the attorney fees clause from the Merger Agreement.

III. *Plaintiff's Contentions*

Plaintiff makes the following contentions in these appeals:

1. The trial court deprived plaintiff of his right to a jury trial by dismissing the section 11 claim during in limine proceedings and erred in concluding that the claim was barred by the statute of limitations.

2. The trial court abused its discretion in precluding plaintiff's expert from testifying about the standards, customs, and general background information pertaining to corporations and the securities industry.

3. The trial court abused its discretion in awarding attorney fees to defendants for defense of the section 11 claim on the ground the claim was "without merit and bordered on frivolity."

4. The trial court erred in awarding defendants attorney fees incurred in defending the cause of action labeled "Breach of Contract" because that cause of action really sounded in tort.

IV. *Photon's Contention*[1]

In its cross-appeal, Photon contends that the Affiliate Agreement, upon which plaintiff's lawsuit was largely based, incorporated the attorney fees

---

[1] Dissly and Sollitto have not appeared in connection with these appeals. Photon is the only respondent and cross-appellant.

clause from the Merger Agreement so that Photon was entitled to recover all its fees incurred in defending this lawsuit.

## V. THE MOTION IN LIMINE CONCERNING THE STATUTE OF LIMITATIONS

### A. Background

█ Section 11 describes the civil liability imposed for filing a false S-4 statement. The section creates a private right of action where, "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ." (15 U.S.C. § 77k(a).) The applicable statute of limitations is set forth in title 15 of the United States Code section 77m, which provides that the action must be commenced "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence," but in no event later than three years after the sale or public offering of the security.

Plaintiff's eighth cause of action alleged that when defendants signed and filed the S-4 Statement on October 27, 1999, the statement contained "untrue and false statements of material facts" and "omitted and failed to state material facts" that misled plaintiff and deprived him of the opportunity to make "intelligent and informed decisions as to whether to agree to the merger and acquire shares of Photon stock." The allegedly false statement was that "the only restrictions on the sale of Photon stock by Amtower would be those imposed by federal law and set forth in the Affiliate Agreement." The S-4 Statement allegedly omitted the material fact that "Photon had an Insider Trading Policy and Securities Watch Team that imposed additional restrictions on the sale of Photon stock." Plaintiff further alleged that he did not know of the falsity of the S-4 Statement until June 1, 2001, when he obtained a copy of the S-4 Statement. Just days before trial, at his continued deposition, plaintiff testified that he had actually read the S-4 Statement in 1999. That testimony showed that plaintiff must have been aware of any deficiency in the statement in 1999, and since the instant action was not filed until April 2001, defendants decided that the section 11 claim must be barred by the one-year statute of limitations. They raised the issue by way of a motion in limine.

The trial court decided to hold a "mini-trial" without a jury. Plaintiff was the only witness. He testified that he had reviewed the S-4 Statement for accuracy in 1999, that he was given an internal company policy on December 7, 1999, that pertained to insider trading, and that he was later given a second policy (the Insider Trading Policy at issue here), which he reviewed and

signed on December 22, 1999. Plaintiff admitted that when he reviewed the S-4 Statement in 1999 he was aware that it made no mention of any insider trading policy. The trial court ruled as follows: "The Court finds that in order for there to be a cause of action here, it must be proven that there was an omission to state a material fact which was required to be stated in the S-4. The Complaint about omissions involved the Insider Trading Policy . . . . [¶] . . . Plaintiff, the Court finds, knew of these material omissions in December of 1999. . . . [¶] The discovery of the omission was December, 1999. Cause of action was not filed until after the year the statute had expired; therefore, this cause of action is time barred."

### B. *Use of the In Limine Proceedings to Dismiss the Eighth Cause of Action*

Plaintiff argues that the trial court's ruling deprived him of his right to a jury trial on the statute of limitations defense. (*Jefferson v. County of Kern* (2002) 98 Cal.App.4th 606, 610 [120 Cal.Rptr.2d 1].) Photon does not dispute that the running of the statute of limitations is ordinarily a question of fact upon which a plaintiff has the right to a jury. Photon's position is that there was no question of fact and that its in limine motion was the proper vehicle for the court to decide the issue as a matter of law.

■ Strictly speaking, Photon's motion was not an in limine motion. In limine motions are designed to facilitate the management of a case, generally by deciding difficult evidentiary issues in advance of trial. " 'The usual purpose of motions *in limine* is to preclude the presentation of evidence deemed inadmissible and prejudicial by the moving party. A typical order *in limine* excludes the challenged evidence and directs counsel, parties, and witnesses not to refer to the excluded matters during trial. (3 Witkin, Cal. Evidence [(3d. ed. 1986)], § 2011 at p. 1969.) "The advantage of such motions is to avoid the obviously futile attempt to 'unring the bell' in the event a motion to strike is granted in the proceedings before the jury." (*Hyatt v. Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 337 [145 Cal.Rptr. 47].)' " (*Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659, 669 [56 Cal.Rptr.2d 803].) What in limine motions are *not* designed to do is to replace the dispositive motions prescribed by the Code of Civil Procedure. It has become increasingly common, however, for litigants to utilize in limine motions for this purpose.

These nontraditional in limine motions can result in a court's dismissing a cause on the pleadings. (See, e.g., *Coshow v. City of Escondido* (2005) 132 Cal.App.4th 687, 701–702 [34 Cal.Rptr.3d 19] [trial court construed motions in limine as a motion for judgment on the pleadings and dismissed the action].) Some courts have also used the in limine process to examine the

sufficiency of the evidence. For example, in *Michelson v. Camp* (1999) 72 Cal.App.4th 955, 960 [85 Cal.Rptr.2d 539], in response to allegations in the defendant's trial brief, the trial court instructed the plaintiffs to make an offer of proof as to the existence of damages. Construing the plaintiffs' offer of proof as tantamount to an opening statement with regard to evidence of damages, the trial court concluded that, as a matter of law, the plaintiffs could not show recoverable damages and granted a nonsuit for the defense. (*Id.* at p. 961.) A similar situation was considered in *Stein-Brief Group, Inc. v. Home Indemnity Co.* (1998) 65 Cal.App.4th 364 [76 Cal.Rptr.2d 3], an insurance coverage case. The trial court ordered the plaintiff to file a pretrial motion in limine setting forth its " 'best case scenario' " in favor of coverage. (*Id.* at p. 368.) The trial court concluded that, even under the plaintiff's best case scenario, there was no potential for coverage and entered judgment for the defense. (*Ibid.*) The appellate court characterized the "unusual and unorthodox procedure" as, in effect, a motion for nonsuit, or demurrer to the evidence. (*Id.* at p. 369; see also *Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 748–749 [135 Cal.Rptr.2d 433] [trial court granted nonsuit on its own motion after studying the law and inviting stipulations concerning the contractual relationship between the parties].)

In purpose and effect, the foregoing nonstatutory procedures are merely substitutes for the dispositive motions authorized by statute. Appellate courts are becoming increasingly wary of this tactic. (See *R & B Auto Center, Inc. v. Farmers Group, Inc.* (2006) 140 Cal.App.4th 327, 371 [44 Cal.Rptr.3d 426] (conc. opn. of Rylaarsdam, J.) ["To have the sufficiency of the pleading or the existence of triable issues of material fact decided in the guise of a motion in limine is a perversion of the process."].) The disadvantages of such shortcuts are obvious. They circumvent procedural protections provided by the statutory motions or by trial on the merits; they risk blindsiding the nonmoving party; and, in some cases, they could infringe a litigant's right to a jury trial. (Cal. Const., art. I, § 16.) Adherence to the statutory processes would avoid all these risks. Furthermore, these irregular procedures can result in unnecessary reversals. The risk of reversal arises when appellate courts are required to review a dispositive ruling on an in limine motion as if it were the product of a motion for nonsuit after opening statement. "[G]ranting of a nonsuit after an opening statement is a disfavored practice; it will be upheld only when it is clear that counsel has undertaken to state all of the facts which he expects to prove and it is plainly evident that those facts will not constitute a cause of action." (*Uccello v. Laudenslayer* (1975) 44 Cal.App.3d 504, 509 [118 Cal.Rptr. 741]; see *John Norton Farms, Inc. v. Todagco* (1981) 124 Cal.App.3d 149, 161 [177 Cal.Rptr. 215].) The standard of review in such cases requires that all inferences and conflicts in the evidence be resolved in favor of the losing party and *against* the judgment. (*Panico v. Truck Ins. Exchange* (2001) 90 Cal.App.4th 1294, 1296 [109 Cal.Rptr.2d 638].) In

contrast, on appeal from a judgment following trial, appellate review favors the judgment. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227].) Thus, some cases will be subject to reversal where, had the trial court just taken the time to hold a trial, reversal would not be warranted. (*Panico v. Truck Ins. Exchange, supra*, 90 Cal.App.4th at p. 1296.)

■ In spite of the obvious drawbacks to the use of in limine motions to dispose of a claim, trial courts do have the inherent power to use them in this way. (*Lucas v. County of Los Angeles* (1996) 47 Cal.App.4th 277, 284–285 [54 Cal.Rptr.2d 655]; see also *Coshow v. City of Escondido, supra*, 132 Cal.App.4th at pp. 701–702; cf. *Atkinson v. Elk Corp., supra*, 109 Cal.App.4th 739, 748–749 [finding the court's nonsuit before opening statement to be "irregular" but not prejudicial]; see Code Civ. Proc., § 128.) Courts have inherent power, separate from any statutory authority, to control the litigation before them and to adopt any suitable method of practice, even if the method is not specified by statute or by the Rules of Court. (*Bauguess v. Paine* (1978) 22 Cal.3d 626, 636–637 [150 Cal.Rptr. 461, 586 P.2d 942]; *Tide Water Assoc. Oil Co. v. Superior Court* (1955) 43 Cal.2d 815, 825 [279 P.2d 35]; *Citizens Utilities Co. v. Superior Court* (1963) 59 Cal.2d 805, 812–813 [31 Cal.Rptr. 316, 382 P.2d 356].) But when the trial court utilizes the in limine process to dispose of a case or cause of action for evidentiary reasons, we review the result as we would the grant of a motion for nonsuit after opening statement, keeping in mind that the grant of such a motion is not favored, that a key consideration is that the nonmoving party has had a full and fair opportunity to state all the facts in its favor, and that all inferences and conflicts in the evidence must be viewed most favorably to the nonmoving party.

■ In the present case, plaintiff did not make an opening statement. And, unlike the process employed in some of the above-noted cases, plaintiff was not offered the chance to make a comprehensive offer of proof. (See, e.g., *Michelson v. Camp, supra*, 72 Cal.App.4th at p. 960; *Stein-Brief Group, Inc. v. Home Indemnity Co., supra*, 65 Cal.App.4th at p. 368.) He certainly was not afforded the detailed procedural protections he would have had if Photon had filed a summary adjudication motion or had the court allowed the statute of limitations defense to be tried separately as contemplated by Code of Civil Procedure section 597. Nevertheless, the perfunctory nature of the proceedings does not warrant reversal if the record shows that plaintiff could not have prevailed under any circumstances. (*Atkinson v. Elk Corp., supra*, 109 Cal.App.4th at pp. 748–749.) That is the case here. As we shall explain in the following part, plaintiff could not have produced any additional evidence that would have changed the result. Accordingly, the procedural irregularity was harmless.

## C. The Statute of Limitations

Plaintiff maintains that actual knowledge of the contents of the S-4 Statement and the Insider Trading Policy was not sufficient to put him on inquiry notice of fraud. Simply knowing that the S-4 Statement failed to mention the Insider Trading Policy was not enough, he says, to put him on notice that the S-4 Statement contained a material omission, namely, that his stock would not be "freely transferable" except as specified in the Affiliate and Lockout Agreements. He claims that merely reading the documents did not give him reason to believe that defendants "were affirmatively lying and actively concealing the true nature and meaning of the policy."

Defendants' representations to plaintiff outside the S-4 Statement are not relevant to the section 11 claim. Section 11 is a strict liability statute. (*In re Daou Systems, Inc.* (9th Cir. 2005) 411 F.3d 1006, 1027.) Violation of section 11 does not require proof of plaintiff's reliance or any of the elements of fraud. (See *Fischman v. Raytheon Mfg. Co.* (2d Cir. 1951) 188 F.2d 783, 785; *In re Global Crossing, Ltd. Securities Litigation* (S.D.N.Y. 2003) 313 F.Supp.2d 189, 206.) Violation of section 11 is established by showing that the registration statement contained an omission or misrepresentation and that the omission or misrepresentation was such that it would have misled any reasonable investor about the nature of the investment. (*In re Stac Electronics Securities Litigation* (9th Cir. 1996) 89 F.3d 1399, 1403–1404.) The limitations period for a section 11 claim begins to run upon "discovery of the untrue statement or the omission." (15 U.S.C. § 77m.) The cases plaintiff cites are inapplicable here because they involve securities *fraud* actions; they do not pertain to section 11. (*Gray v. First Winthrop Corp.* (9th Cir. 1996) 82 F.3d 877 [section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.)]; *Davis v. Birr, Wilson & Co., Inc.* (9th Cir. 1988) 839 F.2d 1369, 1370 [same]; *Cook v. Avien, Inc.* (1st Cir. 1978) 573 F.2d 685, 697 [section 12 of the Securities Act of 1933].)

Dissly's alleged assurances to plaintiff did not change the fact that the S-4 Statement did not mention the company's internal policies limiting transferability of the shares beyond that described in the statement. Limitations in the insider trading policies that did not appear in the S-4 Statement were the quarterly blackout periods and the requirement that insiders obtain approval before selling their shares at any time outside those blackout periods. There is no dispute that these omissions were material. Indeed, that is the gist of plaintiff's entire case. Plaintiff conceded in the pretrial hearing that he had seen and read the S-4 Statement and both insider trading policies in 1999. These facts conclusively demonstrate that plaintiff had actual knowledge, in 1999, of a material omission or misrepresentation in the S-4 Statement. Since he did not file his complaint until April 2001, well over a year after he admittedly read all the pertinent documents, the section 11 claim was barred.

■ Plaintiff argues that the statute was tolled during the time defendants owed him a fiduciary duty as the officers and directors of Photon. We reject the argument. It is true that, in some cases, a confidential or fiduciary relationship between a defendant and a plaintiff will toll the statute of limitations. (*United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 598 [83 Cal.Rptr. 418, 463 P.2d 770].) That is because such relationships carry a duty of full disclosure and delaying accrual of the statute "prevents the fiduciary from obtaining immunity for an initial breach of duty by a subsequent breach of the obligation of disclosure." (*Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 189 [98 Cal.Rptr. 837, 491 P.2d 421].) Here, defendants disclosed the facts necessary to support the section 11 cause of action in December 1999. Even if the one-year statute is subject to tolling, we decline to apply the concept in this case since the nature of the relationship between plaintiff and defendants did not prevent plaintiff from discovering the misrepresentations in the S-4 Statement.

Accepting, as we must, that the facts to which plaintiff testified are true (*Stein-Brief Group, Inc. v. Home Indemnity Co., supra,* 65 Cal.App.4th at p. 369), the inescapable conclusion is that the section 11 claim was barred by the statute of limitations as a matter of law. There is no evidence that plaintiff could produce that would change this result. Accordingly, there was no issue for the jury to decide and the trial court properly dismissed the section 11 claim.

VI. DEFENDANTS' MOTION IN LIMINE REGARDING EXPERT TESTIMONY

A. *Background*

Defendants' motions in limine also sought an order limiting or excluding the testimony of plaintiff's expert, Professor Kenneth E. Scott, a retired professor of law and business at Stanford University. Defendants maintained that the professor's intended testimony would consist primarily of explanations of the law, subjects that defendants claimed were inappropriate for expert testimony and, therefore, should be excluded. Plaintiff's counsel explained that Scott would testify as to the types of things that are disclosed in an S-4 Statement as a matter of good corporate practice. He would also testify about the fiduciary relationship between a corporation's officers and directors and its shareholders. The trial court deferred ruling on the motion and obtained a copy of the expert's deposition to read.

On the day Scott was to testify, the trial court made its ruling. The court noted that Scott's deposition had made it clear that he was prepared to testify about only the section 11 and breach of fiduciary duty causes of action. Therefore, Scott could not render any opinions on the fraud counts. "He

didn't do so at deposition; he should not be allowed to do so now." As to the breach of fiduciary duty cause of action, Scott had opined that, to the extent Dissly or Sollitto had induced plaintiff to sign an agreement by untruthful statements, they had breached the fiduciary duty they owed him as shareholder. The court pointed out that, assuming the case went to the jury, there would be an instruction on the fiduciary duty that officers and directors owed to the shareholders. "There's a question in my mind as to whether the things that Professor Scott is going to talk about are really things that the jurors don't understand already." Although the court was tempted to exclude the testimony altogether, the court decided to allow limited questioning. "The question I'm going to allow is, in essence, assuming that the judge tells the jury that a director owes a duty of candor and good faith and fair dealing to its shareholders, how did Mr. Dissly violate that duty in his discussions with—with Mr. Amtower vis-à-vis getting him to sign the shareholder agreement. That's it. That's what I'm allowing."

Once Scott took the stand, plaintiff's counsel asked a number of questions to which objections were sustained on grounds of relevance, overbreadth, and, in some instances, that the question called for a conclusion of law. For example, counsel asked, "Can you tell us, . . . what a corporation is and how it comes into existence?" "[C]an you describe for us what the basic duties of a fiduciary are[?]" "And can you tell us what the fiduciary duty is that a director, and officer has to a shareholder?"

Finally, counsel posed, without objection, one long hypothetical question. He asked Scott to assume as true plaintiff's version of the events, i.e., that the agreements were signed and representations were made as plaintiff claimed they had been. Counsel then asked if, under those circumstances, it was Scott's opinion that Dissly had violated his fiduciary duty. Scott agreed that, yes, that would be his opinion, and he was allowed to explain why that was so.

B. *Analysis*

██ The opinion of an expert witness is limited to testimony "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) "On the other hand, '[e]xpert opinion is not admissible if it consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of fact as by the witness.' " (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506 [68 Cal.Rptr.2d 135].) Furthermore, "[T]he calling of lawyers as 'expert witnesses' to give opinions as to the application of the law to particular facts usurps the duty of the trial court to instruct the jury on the law as applicable to the facts, and results in no more than a modern day 'trial by oath' in which

the side producing the greater number of lawyers able to opine in their favor wins." (*Downer v. Bramet* (1984) 152 Cal.App.3d 837, 842 [199 Cal.Rptr. 830].) On review, we may not disturb the trial court's ruling on the admissibility of opinion evidence absent an abuse of discretion. (*Caloroso v. Hathaway* (2004) 122 Cal.App.4th 922, 928 [19 Cal.Rptr.3d 254].)

Plaintiff maintains that he should have been allowed to ask Scott questions concerning the standards, customs, and practices in the securities industry. The testimony was necessary, plaintiff claims, to assist the jury in making its determinations on the "ultimate questions of whether defendants violated section 11 of the Securities Act and defrauded and breached a fiduciary duty" to plaintiff and to allow Scott to comment upon issues critical to assessing the parties' credibility.

To the extent plaintiff's argument is that the testimony was relevant to plaintiff's section 11 claim, we reject it. The trial court properly dismissed that claim prior to trial. To the extent plaintiff's argument is that testimony was relevant to his fraud claims, we reject that as well. The trial court properly prohibited any opinions relating to the fraud causes of action since Scott had testified at his deposition that he had formed no opinions on those causes of action. (*Jones v. Moore* (2000) 80 Cal.App.4th 557, 564–565 [95 Cal.Rptr.2d 216] [trial court may exclude expert opinion that goes beyond the opinions expressed at deposition].) The only remaining cause of action to which the expert could properly have testified was the cause of action for breach of fiduciary duty.

The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach. (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 483 [80 Cal.Rptr.2d 329].) Whether a fiduciary duty exists is generally a question of law. (*David Welch Co. v. Erskine & Tulley* (1988) 203 Cal.App.3d 884, 890 [250 Cal.Rptr. 339].) Whether the defendant breached that duty towards the plaintiff is a question of fact. (*Ibid.*) Thus, insofar as the excluded testimony would have described the fiduciary relationship, it was properly excluded as pertaining to a question of law. The judge would explain that in the jury instructions. (*Downer v. Bramet, supra*, 152 Cal.App.3d at pp. 841–842.) As to the factual element of breach, Scott was allowed to give his opinion as to how defendants breached their duty to plaintiff. In explaining his opinion, Scott opined: "[T]he statements being made by Mr. Dissly to Mr. Amtower in connection with obtaining his signature, his agreement to the new insider trading policy were untrue and misleading in material respects and that that would violate a fiduciary's duty of honesty and candor in dealing with someone to whom the fiduciary owed that duty." What plaintiff should have been told was "the

accurate state of affairs relating to the policy" and "whether the scope of restriction that he would be agreeing to observe with respect to any transactions in his own Photon stock was as broad as to give the Securities Watch Team, in effect, a complete discretion and absolute veto over any sales of stock by him." We fail to see how a discussion of the customs and practices in the securities industry would have added any substance to plaintiff's fiduciary duty claim. There was no abuse of discretion.

## VII. ATTORNEY FEES

### A. Background

Photon filed a motion for attorney fees. The motion had three bases. Photon first cited title 15 of the United States Code section 77k(e), which allows a prevailing party to recover attorney fees for a section 11 cause of action "if the court believes the suit or the defense to have been without merit." Photon argued that plaintiff's section 11 claim was meritless, and, therefore, it was entitled to recoup the attorney fees it incurred in defending that claim. Second, Photon argued that the attorney fees clause in the employment agreement applied to plaintiff's breach of contract claim so that it was entitled to fees for its defense of that cause of action as well. Third, Photon maintained that the attorney fees clause in the Merger Agreement, which, it claimed, was incorporated into the Affiliate Agreement, provided an independent ground for an order awarding Photon all of its legal expenses incurred in the lawsuit.

The trial court granted the motion in part. With respect to the section 11 claim, the court stated: "The Court finds entirely persuasive that Amtower's section 11 claim was without merit and bordered on frivolity, especially given the Court's conclusion that Amtower knew or reasonably should have known from the outset of filing this cause of action that his section 11 claim would never have survived the limitations period under [title 15 of the United States Code] [s]ection 77m. This Court in its discretion believes that reasonable costs should be awarded Photon for its expenses in defending this claim." The court found that it could not apportion the fees based upon counsel's billing records but recognized that the section 11 claim was narrower in scope than plaintiff's general fraud claims so that all fees generated during the life of the section 11 claim could not fairly be recovered. The court determined that the reasonable amount of attorney fees for the pertinent period from January 2002 (when the section 11 claim was added) to the date of trial was $886,461. The court awarded Photon 20 percent of that total, or $177,292.

The trial court also concluded that Photon was entitled to fees under the employment contract, which included an attorney fees clause, for defense of

plaintiff's breach of contract cause of action. The court determined that plaintiff's tort allegations overlapped the contract allegations such that allocation was not required. The court awarded Photon $203,312, reflecting reasonable attorney fees incurred from April 2001 when the complaint was filed through April 2003 when the breach of contract cause of action was dismissed. The trial court refused to award additional fees under the Merger Agreement.

### B. *Plaintiff's Appeal*

#### 1. *Fees for Defending the Section 11 Claim*

■ Unless a contract or statute provides otherwise, each party to a lawsuit must pay its own attorney fees. (Code Civ. Proc., § 1021.) Section 11(e) provides that if any suit under that section or any other section of the 1933 Securities Act is "without merit," the court may award attorney fees when the defendants prevail. (15 U.S.C. § 77k(e).) "The 'without merit' standard . . . encompasses claims and defenses that *either* are brought in bad faith *or* border on the frivolous." (*Western Federal Corp. v. Erickson* (9th Cir. 1984) 739 F.2d 1439, 1444; see also *Aizuss v. Commonwealth Equity Trust* (E.D.Cal. 1993) 847 F.Supp. 1482, 1491.) We review the trial court's decision awarding fees under section 11(e) for abuse of discretion. (*Layman v. Combs* (9th Cir. 1992) 994 F.2d 1344, 1353.)

■ Plaintiff argues that his section 11 claim was not frivolous because he had a "reasonable basis" for arguing that "just because he 'looked at' the S-4 statement [he was not] on inquiry notice as a matter of law." As we explained above, plaintiff's duty of inquiry is irrelevant. He *actually knew*, in 1999, after reading the S-4 Statement and the Insider Trading Policy, that the S-4 Statement did not contain any reference to the policy, which is the omission that plaintiff claims violated section 11. Plaintiff's insistence that his *actual* knowledge of the omission did not put him on inquiry notice makes no sense. According to Black's Law Dictionary, inquiry notice is "Notice attributed to a person when the information would lead an ordinarily prudent person to investigate the matter further." (Black's Law Dict. (8th ed. 2004) p. 1091, col. 1.) That is to say, the concept of inquiry notice applies only where the plaintiff does not already have actual notice of the facts supporting his cause of action. Section 11 is a strict liability statute. (*In re Daou Systems, Inc.,* *supra*, 411 F.3d at p. 1027.) The mere existence of the omission or misrepresentation is sufficient to support a claim under section 11. Since plaintiff had actual notice of the facts to support his section 11 claim at least as early as December 1999, his repeated insistence that there existed a factual dispute based upon the concept of inquiry notice can reasonably be said to have bordered on the frivolous. The trial court did not abuse its discretion in so finding.

## 2. *Fees for Defense of the Breach of Contract Cause of Action*

The employment agreement between plaintiff and Photon contained an attorney fees clause, which stated, "If either party hereto brings any action to enforce its rights hereunder, the prevailing party in any such action shall be entitled to recover his or its reasonable attorneys' fees and costs incurred in connection with such action." Plaintiff's first cause of action, which was entitled "Breach of Contract," pertained to the employment agreement between plaintiff and Photon. Plaintiff now argues that the cause of action was not really a contract cause of action. The argument is disingenuous, at best.

 " 'Whether an action is based on contract or tort depends upon the nature of the right sued upon, not the form of the pleading or relief demanded. If based on breach of promise it is contractual; if based on breach of a noncontractual duty it is tortious. [Citation.] If unclear the action will be considered based on contract rather than tort. [Citation.] [¶] In the final analysis we look to the pleading to determine the nature of plaintiff's claim.' (*Arthur L. Sachs, Inc. v. City of Oceanside* (1984) 151 Cal.App.3d 315, 322 [198 Cal.Rptr. 483].)" (*Kangarlou v. Progressive Title Co., Inc.* (2005) 128 Cal.App.4th 1174, 1178–1179 [27 Cal.Rptr.3d 754].) Where the pertinent facts are not in dispute, we independently review the trial court's determination pertaining to an award of attorney fees under a contractual provision. (*Id.* at p. 1177.)

Plaintiff claims that, in spite of its contract label, the first cause of action alleged only tort claims—that defendants fraudulently misrepresented and concealed the nature and meaning of the Insider Trading Policy. In the first amended complaint, plaintiff's cause of action for breach of contract alleged that when he signed the employment agreement, "Photon did not intend to perform the conditions of that agreement and breached that agreement when it refused Amtower's requests to sell all of his Photon stock. The Insider [Trading] Policy was one of the internal rules and policies that Photon agreed to follow when it entered into the Employment Agreement with Amtower and the periods of time set forth in the Insider [Trading] Policy in which Amtower could not sell Photon stock were not in effect when Amtower asked for permission to sell all of his Photon stock." Although it is no model of clarity, the paragraph does allege that Photon breached the conditions of the employment agreement when it refused plaintiff permission to sell all his Photon stock. Plaintiff now claims that the pleading was really intended to allege the tort of promissory fraud. That claim is belied by his revision of the first cause of action after the trial court sustained defendants' first demurrer with leave to amend.

In the second amended complaint, the first cause of action was again labeled as a breach of contract cause of action and its specific allegations

were as follows: "When Dissly told Amtower about the Insider [Trading] Policy for the first time . . . and told him that he would be terminated if he did not agree to follow the Insider [Trading] Policy and get permission from the Securities Watch Team before he sold any of his Photon stock, he acted on behalf of Photon and its Board of Directors and made it impossible for Photon to perform the terms of the Employment Agreement and breached the Employment Agreement on behalf of Photon and repudiated it by implication. The Employment Agreement did not give Photon and its Board of Directors the right to terminate Amtower if he did not comply with the Insider [Trading] Policy and get permission from the Securities Watch Team before he sold any of his Photon stock and the threat to terminate Amtower if he did not comply with the Insider [Trading] Policy and get permission from the Securities Watch Team before he sold any of his Photon stock was a breach of the Employment Agreement and anticipatory repudiation of the Employment Agreement."

As this passage plainly shows, the wrong plaintiff was attempting to allege in the first cause of action was defendants' breach of a duty established by the employment agreement. The cause of action does not even touch upon defendants' alleged misrepresentations concerning the Insider Trading Policy. Nor does it allege, as plaintiff now claims, that defendants had fraudulently induced plaintiff to enter into any agreements.

It is true that the cause of action incorporates the factual allegations pertaining to defendants' alleged fraud as set forth in the first part of the pleading. But the first cause of action repeatedly invokes the language of contract and the prayer includes a request for attorney fees, the only source for which is the employment agreement. Thus, the first cause of action was unquestionably an attempt by plaintiff to enforce his rights under the employment agreement; it was an action on the contract. Photon was entitled to its attorney fees in defending that claim.

### 3. *Apportionment*

Plaintiff finally contends that the trial court abused its discretion in failing to apportion the fees Photon incurred up to the time the contract cause of action was dismissed. *Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129 [158 Cal.Rptr. 1, 599 P.2d 83], which involved a claim for fees under Civil Code section 1717, held as follows: "Where a cause of action based on the contract providing for attorney's fees is joined with other causes of action beyond the contract, the prevailing party may recover attorney's fees under section 1717 only as they relate to the contract action." The court clarified that fees need not be apportioned "when incurred for representation on an issue common to both a cause of action in which fees are proper and

one in which they are not allowed. All expenses incurred with respect to the [issues common to all causes of action] qualify for award." (*Reynolds Metals Co. v. Alperson, supra,* 25 Cal.3d at pp. 129–130.) Thus, allocation is not required when the issues are "so interrelated that it would have been impossible to separate them into claims for which attorney fees are properly awarded and claims for which they are not." (*Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1133 [94 Cal.Rptr.2d 448].)

Where fees are authorized for some causes of action in a complaint but not for others, allocation is a matter within the trial court's discretion. (*Erickson v. R.E.M. Concepts, Inc.* (2005) 126 Cal.App.4th 1073, 1083 [25 Cal.Rptr.3d 39].) A trial court's exercise of discretion is abused only when its ruling " ' " 'exceeds the bounds of reason, all of the circumstances before it being considered.' " ' " (*San Dieguito Partnership v. San Dieguito River Valley Regional etc. Authority* (1998) 61 Cal.App.4th 910, 920 [72 Cal.Rptr.2d 91], disapproved on another point in *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084 [95 Cal.Rptr.2d 198, 997 P.2d 511].)

Plaintiff argues the trial court abused its discretion in failing to apportion fees incurred on the contract claim and fees incurred on the remaining seven causes of action. Plaintiff cites *Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265, 1296–1297 [87 Cal.Rptr.2d 497], in support of his argument. In *Heppler,* the plaintiffs sued a contractor, who cross-complained against four subcontractors, for construction defects. The trial court awarded plaintiffs all their requested attorney fees against one subcontractor, Martin, pursuant to a contract provision. The Court of Appeal found this to be an abuse of discretion, noting: "Martin's part of the case could have been tried in considerably less time than seven weeks had the trial not taken up issues that involved the other nonsettling subcontractors. It strikes us as eminently unfair to tag Martin with all of plaintiffs' attorney fees for the entire seven-week trial. [¶] . . . [¶] Not all the issues involving Martin's case were integrally associated with the other issues in the case; at the very least, some of them could have been severed and isolated for purposes of the attorney fees award." (*Id.* at p. 1297.)

This case is not like *Heppler.* In *Heppler,* there was a clear line of demarcation between the claims against one subcontractor and the claims against the others. Here there is no clear distinction. Although there were seven causes of action other than the breach of contract cause of action, the allegations of all eight overlapped. Plaintiff alleged that defendants misrepresented and concealed material information that led him to enter into agreements to which he would not have agreed otherwise, that as a result of those misrepresentations plaintiff acquired Photon stock that he was prevented from selling, and that defendants' conduct in preventing plaintiff from selling the

stock was a breach of one or more of the agreements. All of the causes of action in the pleading relied upon the same factual allegations. Considering these circumstances, the trial court's ruling that the legal services rendered on behalf of the contract cause of action could not be separated from the services rendered for the lawsuit as a whole did not exceed the bounds of reason.

### C. *Photon's Cross-appeal*

#### 1. *Fees Under the Affiliate Agreement*

Except for the first cause of action for breach of contract, which focused upon the employment agreement, plaintiff's suit was primarily based upon the Affiliate and Lock-Up Agreements. Plaintiff claimed that he was led to believe that the Affiliate and Lock-Up Agreements, in combination with federal law, set the rules pertaining to his sale of Photon stock but that defendants' actual intention was to prevent him from selling all his stock, in spite of the conditions set forth in those two agreements. Following trial, Photon argued that the Affiliate Agreement, which did not contain an attorney fees clause, effectively incorporated all the terms of the Merger Agreement, which did. Photon claimed, therefore, that it was entitled to all its reasonable attorney fees defending the entire action. The trial court rejected the argument. Photon now argues that the trial court erred in its interpretation of the agreements.

As we stated above, the determination of the legal basis for an attorney fee award is a question of law, which we review independently of the trial court. (*Akins v. Enterprise Rent-A-Car Co., supra*, 79 Cal.App.4th at pp. 1132–1133.) In particular, we independently review the trial court's determination with respect to whether the terms of a written agreement constitute a legal basis for awarding attorney fees. (*Exxess Electronixx v. Heger Realty Corp.* (1998) 64 Cal.App.4th 698, 705 [75 Cal.Rptr.2d 376].) To resolve the parties' dispute concerning the meaning of the two agreements at issue, "we resort to the traditional rules governing interpretation of contracts, which 'teach us that the overriding goal of interpretation is to give effect to the parties' mutual intentions as of the time of contracting. . . . Where contract language is clear and explicit and does not lead to absurd results, we ascertain intent from the written terms and go no further.' " (*Shaw v. Regents of University of California* (1997) 58 Cal.App.4th 44, 53 [67 Cal.Rptr.2d 850] (*Shaw*), quoting *Ticor Title Ins. Co. v. Employers Ins. of Wausau* (1995) 40 Cal.App.4th 1699, 1707 [48 Cal.Rptr.2d 368].)

The parties to the Merger Agreement were Photon and CRT. In that agreement there was an attorney fees clause, which provided: "If any action or proceeding relating to this Agreement or the enforcement of any provision of this Agreement is brought against any party hereto, the prevailing party

shall be entitled to recover reasonable attorney fees, costs and disbursements . . . ." There was also a clause providing that the rights and remedies of the parties to the agreement were "cumulative" and in the event of any breach or threatened breach by one party the other party shall be entitled to an order enforcing the terms of the agreement or restraining its breach. An integration clause stated that "This Agreement and the other agreements referred to herein set forth the entire understanding of the parties hereto relating to the subject matter hereof . . . ." The Affiliate Agreement was one of the agreements referred to in the body of the Merger Agreement because delivery of the signed Affiliate Agreements from all persons identified as affiliates was one of the conditions precedent to the merger.

The parties to the Affiliate Agreement were Photon and plaintiff. The Affiliate Agreement mentioned the Merger Agreement in its introduction. It also mentioned the Merger Agreement in the clause that provided: "Nothing in this Affiliate Agreement shall limit any of the rights or remedies of [Photon] under the [Merger Agreement], or any of the rights or remedies of [Photon] or any of the obligations of Shareholder under any agreement between Shareholder and [Photon] . . . and nothing in the [Merger Agreement] . . . shall limit any of the rights or remedies of [Photon] or any of the obligations of Shareholder under this Affiliate Agreement." The Merger Agreement was also mentioned in the integration clause: "This Affiliate Agreement, the [Merger Agreement], and any Shareholder Agreement or Noncompetition Agreement between Shareholder and Parent collectively set forth the entire understanding of [Photon] and Shareholder relating to the subject matter hereof and thereof and supersede all other prior agreements and understandings between [Photon] and Shareholder relating to the subject matter hereof and thereof."

Like the Merger Agreement, the Affiliate Agreement contained a clause referring to the independence of its obligations: "The covenants and obligations of Shareholder set forth in this Affiliate Agreement shall be construed as independent of any other agreement or arrangement between Shareholder, on the one hand, and [CRT or Photon] on the other." The Affiliate Agreement also provided, in language similar to that contained in the Merger Agreement, that the parties had the right to an order of specific performance, mandamus, or injunction to enforce the terms of the agreement. Unlike the Merger Agreement, the Affiliate Agreement contained no attorney fees clause.

Defendants argue that even though plaintiff was not a party to the Merger Agreement, the Affiliate Agreement incorporated the whole of the Merger

Agreement such that the attorney fees clause from the Merger Agreement is an actual part of the Affiliate Agreement and may be enforced directly against plaintiff. In support of this argument Photon cites *Republic Bank v. Marine Nat. Bank* (1996) 45 Cal.App.4th 919 [53 Cal.Rptr.2d 90]. The case is inapposite. In *Republic Bank,* a sublease, which did not contain an attorney fees clause, expressly incorporated a master lease, which did: " '[A] copy of the Master Lease is attached hereto as Exhibit "C" and incorporated herein by this reference. Sub-Tenant agrees not to violate, cause to be violated, or cause Sub-Landlord to be in violation of, the terms, covenants and conditions of the Master Lease and further agrees that the terms of this Lease shall be subject and subordinate to the Master Lease.' " (*Id.* at p. 921.) The appellate court concluded that the express incorporation by reference "makes the document referred to part of the contract *as if it were recited verbatim.* So incorporated, the sublease thus 'specifically' provided for attorney fees." (*Ibid.*) In this case, the Affiliate Agreement did not expressly incorporate by reference the provisions of the Merger Agreement.

Photon contends that, notwithstanding the absence of an express incorporation of the Merger Agreement, the Affiliate Agreement, in effect, incorporated the Merger Agreement by virtue of its integration clause. Photon cites *Shaw, supra,* 58 Cal.App.4th 44, in support of the argument. The plaintiff in *Shaw* was a university professor. As a condition of employment by the university, the professor was required to assign to the university any of his inventions and patents conceived in the course of employment. As consideration for the assignment, he was to receive a percentage of the net royalties and fees. (*Shaw, supra,* 58 Cal.App.4th at p. 47.) The professor signed a document entitled patent agreement, by which he expressly assigned to the university the rights to his inventions. Attached to the patent agreement was the university's patent policy, which stated that the university paid 50 percent of net royalties for any patented invention. (*Id.* at pp. 47–49.) Later, the university changed its policy, reducing the percentage of royalties it would pay. The university claimed that the professor was subject to the new policy and was not entitled to the 50 percent set forth in the policy attached to the agreement he signed. The professor argued that the original patent policy was actually part of the agreement he had signed. The appellate court agreed.

*Shaw* explained: " 'A contract may validly include the provisions of a document not physically a part of the basic contract. . . . "It is, of course, the law that the parties may incorporate by reference into their contract the terms of some other document. [Citations.] But each case must turn on its facts. [Citation.] For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties." ' [Citations.] [¶]

The contract need not recite that it 'incorporates' another document, so long as it 'guide[s] the reader to the incorporated document.' " (*Shaw, supra*, 58 Cal.App.4th at p. 54.) Although the patent agreement did not expressly incorporate the patent policy, the patent agreement "(1) direct[ed] Shaw to 'Please read the Patent Policy on reverse side and above,' and (2) state[d] that, in signing the patent agreement, Shaw is 'not waiving any rights to a percentage of royalty payments received by University, *as set forth in University Policy Regarding Patents.*' (Italics added.)" (*Ibid.*) The appellate court found, based on these facts, that the patent policy was incorporated by reference into the patent agreement, and that the university was bound by the policy's terms. (*Id.* at pp. 54–55.)

Photon also cites *Wolschlager v. Fidelity National Title Ins. Co.* (2003) 111 Cal.App.4th 784 [4 Cal.Rptr.3d 179] (*Wolschlager*). In *Wolschlager,* the issue was whether an arbitration clause contained in a policy of title insurance bound a plaintiff suing for errors in the preliminary report, which did not contain such a clause. (*Id.* at p. 786.) The preliminary report did not expressly incorporate the policy by reference, but it did mention the policy in several places, specifically stated that the policy " 'should be read,' " and directed the reader to where the policy could be found. (*Id.* at p. 787.) This court held that since the preliminary report specifically identified the policy, described the form that it would take, and told the recipient where it could be found, the incorporation was clear and unequivocal and easily available to the recipient such that it was impliedly incorporated by reference. (*Id.* at p. 791.)

Both *Shaw* and *Wolschlager* are distinguishable from the instant matter. Plaintiff was certainly aware of the terms of the Merger Agreement since he participated in its negotiation and actually signed it on behalf of CRT. But it is not simply the party's awareness of the other document that is required. To impliedly incorporate an external document by reference, the subject document must contain some clear and unequivocal reference to the fact that the terms of the external document are incorporated. In *Shaw,* the clear and unequivocal reference was the express mention that the professor would retain his rights under the attached royalty policy. In *Wolschlager,* the insured had solicited the preliminary report for the very purpose of obtaining the policy. That aspect of the transaction and the express direction to the insured to read the policy clearly indicated that the terms of the policy applied to any action based upon the preliminary report. (*Wolschlager, supra,* 111 Cal.App.4th at p. 790.) There are no similar connections between the Affiliate and Merger Agreements in this case.

There are three references to the Merger Agreement in the Affiliate Agreement, none of which suggests that its terms are applicable to plaintiff. Reference to the Merger Agreement in the introductory clause provides

background for the purpose and intent of the Affiliate Agreement. Its mention in the rights and remedies clause serves more to separate the two agreements rather than to incorporate one into the other. The purpose of an integration clause is to preclude the introduction of evidence which varies or contradicts the terms of the written instruments. (Code Civ. Proc., § 1856, subd. (a); *Slivinsky v. Watkins-Johnson Co.* (1990) 221 Cal.App.3d 799, 804–805 [270 Cal.Rptr. 585].) It does not function to meld the documents it mentions. Thus, the mention of the Merger Agreement in these provisions is not the same as specifically directing the parties' attention to the terms of the external document in a manner that could be construed as eliciting the parties' consent to its separate terms. Furthermore, the Affiliate Agreement does not look to the Merger Agreement to fill in a missing term. It is complete in itself. Indeed, the Affiliate Agreement duplicates several of the terms contained in the Merger Agreement. And unlike the facts in either *Shaw* or *Wolschlager*, the Merger Agreement is a separate contract that plaintiff did not solicit and to which he was not a party. The Merger Agreement was not attached to the Affiliate Agreement and the Affiliate Agreement did not refer to it as providing any rights or remedies to plaintiff. Indeed, Photon does not maintain that plaintiff would be bound by any terms of the Merger Agreement other than the attorney fees clause. In sum, we find nothing in the plain language of the Affiliate Agreement to suggest that the parties intended to incorporate within it the attorney fees provision of the Merger Agreement.

Photon argues that the Affiliate and Merger agreements were interdependent components of the same transaction and, therefore, should be construed together. In support, Photon relies upon *Harm v. Frasher* (1960) 181 Cal.App.2d 405 [5 Cal.Rptr. 367] (*Frasher*), which involved the stock sale of a business somewhat similar to the transaction in this case. *Frasher* does not support the proposition urged.

In *Frasher,* each of the two owners of a trucking business, Harm and Frasher, promised, in separate agreements with the buyer, to sell their stock in the business to the buyer. There was a third contract between the buyer on the one hand and Harm and Frasher on the other, purporting to sell their copartnership business. (*Frasher, supra,* 181 Cal.App.2d at p. 410.) "Each of the three agreements in substance stated that, as a condition precedent to the obligation of either party to perform thereunder, the sales in the other two agreements 'shall be ready for closing at the same time as the transaction provided for herein.' " (*Id.* at p. 411.) But when the time came for performance, Frasher refused to perform under its separate contract with the buyer. (*Ibid.*) Harm sued Frasher for damages. Frasher argued that the only agreement Frasher breached was the sales agreement between Frasher and the buyer. The appellate court held that "the transaction in question involved a

sale by three different sellers to one buyer; each seller agreed to sell certain specifically described property as a part of a total sale; and each agreed that performance by the buyer was contingent upon performance by all three sellers. The promise of each seller was directed not only to the buyer, but also to the other sellers." (*Id.* at pp. 416–417.) Construing the three agreements together as one transaction, the *Frasher* court concluded that Frasher's refusal to perform was a breach of the duty of good faith and fair dealing Frasher owed to Harm, even though Harm was not a signatory to the written agreement Frasher had breached. (*Id.* at p. 417.) Indeed, it is the rule that "[s]everal contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." (Civ. Code, § 1642.) But nothing in *Frasher*, or the general rule as stated in Civil Code section 1642, supports the conclusion that, where the contracts form part of a single integrated transaction, a discrete term contained in one agreement is necessarily applicable to the parties to one of the other agreements.

For all these reasons, we conclude that the trial court did not err in refusing to award attorney fees under the Affiliate Agreement.

### 2. *Attorney Fees on Appeal*

Photon argues that it is entitled to recover all its attorney fees incurred on appeal. Photon is entitled to the fees incurred in defending the appeal in case No. H030386 to the extent that the appeal is related to plaintiff's section 11 causes of action. (See *Villinger/Nicholls Development Co. v. Meleyco* (1995) 31 Cal.App.4th 321, 329 [37 Cal.Rptr.2d 36] [where party entitled by contract or statute to recover fees as prevailing party, right includes fees incurred on appeal].) Although we have the power to appraise and fix attorney fees on appeal, we deem it the better practice to remand the cause to the trial court to determine the appropriate amount of such fees. (*Akins v. Enterprise Rent-A-Car Co., supra*, 79 Cal.App.4th at pp. 1134–1135.)

### VIII. DISPOSITION

The judgment in case No. H030386 is affirmed. Photon shall recover its costs on appeal. Photon shall recover its attorney fees to the extent such fees are available under title 15 of the United States Code section 77k(e). The matter is remanded to the trial court with directions to conduct a hearing to determine the reasonable amount of attorney fees and costs to be awarded.

The order awarding attorney fees in case No. H030477 is affirmed. The parties shall bear their own costs on appeal in that case.

Rushing, P. J., and Elia, J., concurred.

On February 15, 2008, the opinion was modified to read as printed above. The petition of appellant Richard Amtower for review by the Supreme Court was denied April 9, 2008, S161284.