Filed 1/9/15  P. v. Smith CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>DEANTE SMITH,<br><br>       Defendant and Appellant. | B250674<br><br><br>(Los Angeles County<br>Super. Ct. No. MA052542) |

Appeal from a judgment of the Superior Court of Los Angeles County.  Kathleen Blanchard, Judge.  Affirmed with directions.

William Hassler for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., and Brendan Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Deante Smith appeals from his conviction and sentencing for two counts of assault with a firearm and two counts of battery causing serious bodily injury, along with findings on associated allegations that he had personally inflicted great bodily injury, that he personally used a firearm, and he had two prior serious of violent felony convictions. His appeal challenges (1) the trial court's exclusion of certain expert opinion testimony offered to raise doubt as to the victims' eyewitness identification of him; (2) the court's failure to instruct the jury on the lesser included offense of simple assault; and (3) the excessive length of the sentence imposed by the court. Respondent asks that we order clerical corrections to the Abstract of Judgment. We affirm the judgment.

## The Facts[1]

Shortly after one o'clock in the morning of March 31, 2011, Donald and Melissa Howard arrived unannounced at the Lancaster home of Mary Pryzballa, a long-time friend of Melissa.[2] The purpose of the Howards' early-morning visit was to talk with Pryzballa about the passing of Melissa's aunt the previous evening. They parked in the driveway, went to the porch, and knocked on the door of the unlit house. Hearing no response, they returned to their car.

As they prepared to leave, appellant came from the house. When Donald asked him whether his wife could speak with Pryzballa, appellant reentered the house.[3] He again emerged a few seconds or minutes later, holding a gun. He went to Donald (who

---

[1] The facts are recited consistent with the presumption that the court and jury found all facts supported by substantial evidence that are consistent with the verdicts and judgment. (*Stewart v. Langer* (1935) 9 Cal.App.2d 60, 61.) Facts not relevant to the issues raised by the appeal are omitted.

[2] The record contains various spellings of Ms. Pryzballa's name (e.g., Pryzbala, Pryzbella, Przybyla). We adopt the spelling used in the parties' briefs and most frequently in the transcript of proceedings.

[3] For simplicity, Mr. and Ms. Howard are identified by their given names.

was by then sitting in the driver's seat of the car with the door open) and attacked Donald with one "straight punch" to his face. Appellant then went to the passenger side of the car where Melissa was standing, hitting her on the head and knocking her to the ground.

Donald did not see a gun, but felt that a gun was used to hit him. Melissa saw appellant approach with a gun, but did not see appellant hitting Donald. Donald revived his wife and helped her into the car, and she called 911 as they drove away. Donald told the police in that call that their attacker had used a gun.

After meeting the police and receiving some medical aid, Donald directed the police to the site of the attack. In a search of the house they found a photograph of appellant wedged in the frame of a bedroom mirror, with a note on the back: "To my future hopefully? Mary Smith. From Mr. D, the real #1. Keeping it 100% for life." When showed the photo, Donald and Melissa both identified its subject as their attacker. (They had met appellant at Pryzballa's home about a month before the attack, though they remembered his name only as "D".) They each also identified appellant from a photo array about two weeks after the attack.

The jury was presented with photos of Donald and Melissa taken after the attacks. The blow to Donald's nose and forehead left a painful cut requiring stitches and leaving a scar. Melissa could not recall her injuries in detail, but said her beating left her with painful bruises on her face, chest, buttocks, ankle, and arm.

The police found a car in Pryzballa's garage that she told them was appellant's, and that there were indications in the backyard someone had used a trashcan to climb over a wall. Appellant was arrested in Las Vegas, Nevada, about a year and a half later.

Pryzballa testified for the defense, most notably that appellant was not present in her home the night of the attacks, that the car in her garage was not registered to him, and that she knew him only as a neighbor. The defense also presented the expert testimony of a university professor of psychology concerning limitations of eyewitness testimony and lineup identifications.

3

**Procedural History**

An amended information filed April 9, 2013, charged appellant in counts 1 and 2 with assault with a firearm on Donald and Melissa, respectively (Pen. Code, § 245, subd. (a)(2)),[4] in count 3 with assault with a deadly weapon on Melissa (§ 245, subd. (a)(1)); and in counts 4 and 5 with battery causing serious bodily injury on Donald and Melissa, respectively (§ 243, subd. (d)). Special allegations alleged that as to counts 1 through 3 appellant personally inflicted great bodily injury (§ 12022.7, subd. (a)), causing the offenses to be serious felonies within the meaning of section 1192.7, subdivision (c)(8); and that he personally used a firearm in committing all the charged offenses (§ 12022.5, subd. (a)), causing the offenses to be serious felonies within the meaning of section 1192.7, subdivision (c)(8). The information alleged also that appellant had two prior convictions for serious or violent felonies under the "Three Strikes" law, section 667, subdivisions (b) through (i), and section 1170.12, subdivisions (a) through (d), and that he had two prior serious felony convictions under section 667, subdivision (a)(1), section 667.5, subdivision (b), and section 1203, subdivision (e)(4).

The trial court granted appellant's motion for acquittal on count 3—assault with a deadly weapon against Melissa (§ 245, subd. (a)(1))—before the case was submitted to the jury, based on insufficiency of the prosecution evidence. (§ 1118.1.)

The jury found appellant guilty on counts 1, 2, 4, and 5, and found the special allegations to be true. Appellant having waived a jury trial on the Three Strikes and serious felony prior conviction allegations, after a court trial of the allegations the court found them to be true. The court sentenced Smith to imprisonment for 81 years to life.[5]

Appellant filed a timely appeal from the judgment.

---

[4] Statutory references are to the Penal Code unless otherwise specified.

[5] The court imposed sentences of 32 and 49 years to life on counts 1 and 2, respectively, and of 29 years (stayed under § 654) on each of counts 4 and 5. It also imposed fines and fees, and awarded custody credits in amounts not relevant to this appeal.

**Discussion**

**I.     The Trial Court Did Not Unduly Limit The Testimony Of Appellant's Expert Witness Regarding Eyewitness And Lineup Identifications.**

Appellant offered the testimony of Mitchell Eisen, Ph.D., a professor of psychology who served as Director of a graduate program in forensic psychology at California State University, Los Angeles.  The subject of Dr. Eisen's intended testimony was the factors that make lineups suggestible, and affect the accuracy of eyewitness identifications, including "that this particular photo line-up was suggestive in nature and how that will have a carry over affect [*sic*]."

The trial court denied the prosecution's motion to exclude the expert's testimony altogether.  But it ruled also that the testimony could not include hypothetical questions based on the evidence in this case.  "You can ask him what makes a suggestive line-up; what makes it suggestive.  You can ask him about things like that.  You cannot ask him hypotheticals; that is absolutely not proper with an identification witness expert."

Dr. Eisen testified on direct examination, without objection, that human memory is imperfect; that people fill the inherent gaps in their memories with inferences that fit; that such reconstructed memories are reinforced when witnesses discuss among themselves the details of an incident they are trying to recall; and that the time a witness is exposed to a face affects how well he or she can pick the face from a group.  Dr. Eisen went on to testify how system variables (for example, whether the witness is shown an individual photo or a group of photos) can affect the reliability of the identification.  He testified why it is important to admonish eyewitnesses against unwarranted assumptions about whether the perpetrator is among those being viewed; how familiarity with the suspect can affect an identification; how "unconscious transference" (in which a witness substitutes a familiar face for the imperfectly recalled face of a perpetrator of a crime) affects eyewitness identifications; the nature and examples of suggestive identification procedures that affect the reliability of the identification; and the fact that once a person has made an identification, the person is likely over a period of time to become more certain of his or her identification.  He testified also that his testimony does not involve

5

review of any evidence concerning the specific facts of the case; his role is to testify to the broad science of identification, rather than the likelihood that any particular witness's identification is right or wrong. "That's what the jury does . . . ."

Appellant challenges the trial court's exclusion of testimony involving hypothetical questions embodying the facts in this case, arguing that he should have been permitted to use such questions, as is generally permitted with respect to (for example) the testimony of a gang expert. The exclusion of such evidence, he contends, deprived him of his fundamental due process right to present evidence in his defense. We review the challenged ruling for abuse of discretion. (*People v. McDonald* (1984) 37 Cal.3d 351, 376, overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 914; *Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1599 ["On review, we may not disturb the trial court's ruling on the admissibility of opinion evidence absent an abuse of discretion"].)

Expert opinion testimony is admissible when its subject is sufficiently beyond the scope of common experience to be of assistance to the trier of fact. (Evid. Code, § 801, subd. (a); *People v. McDonald*, *supra*, 37 Cal.3d at p. 367.) In *People v. McDonald*, *supra*, our Supreme Court held that "in the appropriate case," a trial court's exclusion of expert testimony concerning eyewitness identification would constitute error: "When an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by the jury, it will ordinarily be error to exclude that testimony." (*Id.* at p. 377.) However, "the decision to admit or exclude expert testimony on psychological factors affecting eyewitness identification remains primarily a matter within the trial court's discretion." (*Ibid.*; *People v. Sanders* (1995) 11 Cal.4th 475, 509.)

Here, when appellant offered the testimony of a qualified expert on the specific psychological factors that could affect the accuracy of the eyewitness identifications in this case, the court ruled the evidence admissible and denied the prosecution's motion

6

seeking its exclusion. But the court did not permit the witness to go beyond his explanation of the psychological factors that could affect the accuracy of the eyewitness identifications in this case, to address hypothetical questions based on the facts of this case—presumably including (as counsel explained to the court) the indications "that this particular photo line-up was suggestive in nature and how that will have a carryover affect [*sic*]."[6]

Appellant's claim of error therefore is not that the trial court precluded his expert from explaining the psychological factors that could have affected the accuracy of the witnesses' identification of him as their attacker; his testimony on those subjects was admitted in some detail. Rather, appellant's claim is that the expert was not permitted to tell the jury his own opinion about the reliability of Donald's and Melissa's identifications of appellant, based on the various psychological factors about which he had been permitted to testify.

When eyewitness identification is a key element of the prosecution's case, and it is not substantially corroborated by other evidence, the exclusion of expert opinion testimony concerning the factors affecting such identifications will ordinarily be error. (*People v. Jones* (2003) 30 Cal.4th 1084, 1111-1112; *People v. McDonald*, *supra*, 37 Cal.3d at p. 377.) However, the court does not abuse its discretion by excluding expert opinion testimony where the challenged eyewitness identification testimony is unequivocal and consistent, is corroborated by multiple witnesses, and is not the only evidence linking defendant to the crime. (*People v. Sanders*, *supra*, 11 Cal.4th at pp. 509-510.) The record in this case meets these criteria.

---

[6] An offer of proof is required of a party offering challenged evidence, addressing "[t]he substance, purpose, and relevance of the excluded evidence" (Evid. Code, § 354, subd. (a)), and specifying the evidence to be produced. (*Bowman v. Wyatt* (2010) 186 Cal.App.4th 286, 328-329.) Counsel's quoted explanation to the trial court—the closest he came to identifying the nature and content of the evidence he sought to present—falls far short of the required offer of proof, for it leaves the trial court (and this court) with little information on which to judge the extent to which it might (or might not) assist the jury in evaluating the reliability of the identifications.

7

Donald's and Melissa's identification of appellant as their attacker was immediate, unequivocal, and consistent. Appellant was not unknown to Donald and Melissa the night of the attack. They had been introduced to appellant by Pryzballa at her home, and had spent about 15 minutes in his presence during a visit about a month before the attack. They therefore recognized him when he emerged from Pryzballa's door the night of the attack. They both immediately identified appellant as their attacker when they were showed his photo about an hour after the attack. They both again identified appellant without hesitation from a photo array about two weeks later. And they identified him again at trial.

A number of other pieces of evidence tended to corroborate appellant's presence at Pryzballa's home that night, and his identity as Donald's and Melissa's attacker. In their 911 call to the police minutes after the attack, Donald and Melissa identified appellant as "D," the name they recalled from having earlier met him. That is the name by which appellant had identified himself on the back of the photo the police later found on Pryzballa's mirror, and is the initial letter of appellant's given name. In addition, Pryzballa told the police that night that the car in her garage belonged to appellant. (See *People v. Jones*, *supra*, 30 Cal.4th at pp. 1111-1112 [exclusion of expert opinion testimony concerning eyewitness identifications is justified when other evidence in case substantially corroborates identification of the defendant]; *People v. Sanders*, *supra*, 11 Cal.4th at p. 510 [trial court did not abuse discretion by excluding expert opinion testimony on eyewitness identification].)

Expert opinion is not objectionable merely because it embraces an ultimate issue. (Evid. Code, § 805.) But an expert's admissible testimony must be limited to "a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) "'"Expert opinion is not admissible if it consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of fact as by the witness."'" (*Amtower v. Photon Dynamics, Inc.*, *supra*, 158 Cal.App.4th at p. 1598; *People v. Valdez* (1997) 58 Cal.App.4th 494, 506; *People v. Torres* (1995) 33 Cal.App.4th 37, 47 [expert opinions regarding defendant's guilt or

8

innocence are inadmissible because trier of fact is as competent as witness to draw inferences and conclusions from the evidence].)  "[W]hen an expert's opinion amounts to nothing more than an expression of his or her belief on how a case should be decided, it does not *aid* the jurors, it *supplants* them." (*Summers v. A. L. Gilbert Co*. (1999) 69 Cal.App.4th 1155, 1183.)

In evaluating and weighing the probative value of the proffered evidence against its potential for prejudice and undue consumption of time, the trial court is entitled to (and should) consider the extent to which the additional testimony may or may not assist the jury in its evaluation of the eyewitness identifications.  Here, the trial court applied Evidence Code section 352 to bar the witness from presenting the jury with his opinions on those subjects, apparently concluding that the probative value of the evidence was outweighed by its potential for prejudice and undue consumption of time.

In *People v. Page* (1991) 2 Cal.App.4th 161 (*Page*), the court was faced with circumstances closely analogous to those in the case at hand.  In *Page*, the defendant was tried for murder, based in part on a confession he had given to the police.  The trial court admitted the testimony of an expert psychologist for the defense, concerning factors that can make a person vulnerable to suggestion and lead him to give an inaccurate statement in an interrogation setting.  But much like the challenged ruling in the case at hand, the court excluded the expert's proffered testimony specifically relating these principles to the statements the defendant had given to the police, and expressing his opinion concerning the confession's reliability in light of the circumstances shown by the evidence.  (*Id*. at p. 179.)  On appeal, the court affirmed the exclusion of that testimony.

The court's analysis in *Page* is instructive here.  There, the expert psychologist was permitted to testify at length about the factors that may affect the reliability of a confession.  As in the case at hand, there was no blanket exclusion of evidence concerning the relevant circumstances—in *Page*, the circumstances under which the defendant had confessed; in the case at hand, the circumstances under which Donald and Melissa had each identified appellant as their attacker.  Here, Professor Eisen testified at length concerning how memory works and various factors that tend to influence

9

eyewitnesses to mistakenly identify the perpetrators of traumatic events, to be misled by identifications given by others, and to erroneously cling to their earlier mistaken identifications. In each case, this testimony was admissible to present to the jury a body of information that is sufficiently beyond common experience that the opinion of an expert on the subject would assist the trier of fact. (*People v. McDonald*, *supra*, 37 Cal.3d at p. 369; *Page*, *supra*, 2 Cal.App.4th at pp. 187-188.)

So too, however, here as in *Page*, the trial court was justified in excluding testimony going beyond information that might be helpful to the trier of fact in evaluating the evidence presented at trial, and that would instead have told the jury how it should apply that general information to the evidence. Here, as in *Page,* the trial court was justified in concluding that the testimony given by the experts had sufficiently educated the jury regarding the applicable general principles, such that "'the factual issues in the case [had] become ones that the jurors can answer as easily as the expert.'" (*Page*, *supra*, 2 Cal.App.4th at p. 188.) "In other words, an expert's thorough description of the general principals to be applied in a given case may make additional (and more specific) expert testimony superfluous." (*Ibid.*) "Having been educated concerning those factors" in *Page*, "the jurors were as qualified as the professor to determine if those factors played a role in [the defendant's] confession, and whether, given those factors, his confession was false." (*Id*. at p. 189.)

In the case at hand just as in *Page*, having been educated concerning the factors that lead eyewitnesses to make and cling to erroneous identifications, "the jurors were as qualified as the professor to determine if those factors played a role" in Donald's and Melissa's identification of appellant as their attacker. (*Page*, *supra*, 2 Cal.App.4th at p. 189.) The expert's answers to hypothetical questions that would merely express the inferences and conclusions the witness would draw from the evidence—inferences and conclusions that the jury might as easily itself draw—are not necessary or helpful. "'Where the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates.'" (*People v. Vang* (2011) 52 Cal.4th 1038, 1054.)

10

The expert witness in this case having educated the jury concerning the factors that lead eyewitnesses to make and cling to erroneous identifications, the trial court did not abuse its discretion when it prevented him from further informing the jury about how he would apply those factors to the evidence presented for the jury's consideration. It was within the court's discretion to conclude that the proffered testimony was not sufficiently beyond the jury's understanding to be helpful in its evaluation of the evidence. (*People v. McDonald*, *supra*, 37 Cal.3d at p. 373 [trial court has broad discretion to admit or exclude expert testimony]; *People v. Clark* (1970) 6 Cal.App.3d 658, 664 [same].)

In the absence of a more complete offer of proof we can only assume that if he had not been prevented from doing so, appellant's counsel would have posed hypothetical questions embodying the various factors that Eisen had testified might affect the reliability of an eyewitness identification (such as the lateness of the hour, the Howards' admittedly less-than-complete opportunity to see their attacker, the extremely harrowing circumstances, their initial identification based on a single photograph rather than an array, etc.), with reference to the facts surrounding the Howards' identifications of appellant as their attacker. These factors and facts were already in evidence, and were the subject of the testimony Eisen was permitted to present. Nothing indicates that the jury might have been substantially aided in its evaluation of the evidence by hearing Eisen's own conclusions about the facts that the jury was called upon to decide. (See *People v. Vang*, *supra*, 52 Cal.4th at pp. 1051-1052 [hypothetical questions should not be prohibited solely because they closely track the evidence or express the expert's opinion, but the court has discretion to exclude opinion testimony "regarding the actual defendants, . . . because the jury can determine what the defendants did as well as the expert . . . ."]; *People v. Valdez*, *supra*, 58 Cal.App.4th at p. 506 [expert opinion is not admissible that consists of inferences and conclusions that can be drawn as easily by the trier of fact as by the witness].)

Moreover, even if the trial court's discretionary ruling precluding Dr. Eisen from answering hypothetical questions based on the factual circumstances before the jury had

11

been error, we find that it was harmless to appellant's cause. It is highly improbable that the jury would have returned a verdict more favorable to appellant if it had heard Dr. Eisen testify to his belief that Donald's and Melissa's identifications of appellant as their attacker might have been affected by the circumstances about which he had been permitted to testify at length. (See *People v. Vang*, *supra*, 52 Cal.4th at p. 1052 (conc. opn. of Werdegar, J.).)

**II.    The Trial Court's Failure To Instruct The Jury On The Lesser Included Offense Of Simple Assault Did Not Prejudice Appellant.**

Appellant contends that the trial court erred by failing to instruct the jury on simple assault as a lesser included offense of assault with a firearm as charged in counts 1 and 2. And he claims that he was prejudiced by the failure to give the lesser-included-offense instruction. The record shows otherwise.

At the jury instruction conference, the trial court discussed with counsel whether the jury should be instructed on simple assault (§ 240) as a lesser included offense of the count 1 and 2 charges of assault with a firearm (§ 245, subd. (a)(2)). The court suggested its doubt that such an instruction would be beneficial to appellant, but stated its willingness to give such an instruction "based on the request of the two of you," and that it would consider giving the instruction if the defendant requested it. "I'm simply trying to protect the rights of the defendant in this case. But if—I'm not his attorney—tactically you think you do want that [instruction] in there, then I'll consider giving it." Counsel for both the People and appellant then told the court that neither party was asking that the jury be instructed on the lesser included offense of simple assault to the count 1 and 2 charges of assault with a firearm.

At appellant's request, the court instructed the jury on simple battery (§ 242) as a lesser included offense to the count 4 and 5 offense of battery with serious bodily injury (§ 243, subd. (d)). But with the consent of both parties, it did not instruct the jury on simple assault as a lesser included offense to the count 1 and 2 charges of assault with a firearm.

A lesser included offense is an offense that is encompassed within the charged offense. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) A trial court has a duty to instruct the jury on a lesser included offense—with or without a party's request—whenever the evidence would support a reasonable jury in concluding that the defendant is not guilty of the charged offense, but is guilty of the lesser included offense. (*People v. Avila* (2009) 46 Cal.4th 680, 705; *People v. Cole* (2004) 33 Cal.4th 1158, 1215.) On appeal, we review independently the question whether the trial court improperly failed to instruct the jury on a lesser included offense. (*People v. Souza* (2012) 54 Cal.4th 90, 113.)

The parties have no dispute that simple assault (§ 240) is a lesser included offense of the crime of assault with a firearm (§ 245, subd. (a)(2)), as many cases have at least suggested. (E.g., *People v. Colantuono* (1994) 7 Cal.4th 206, 213, fn. 2 (maj. opn.) & 223, fn. 1 (conc. opn. of Mosk, J.); *People v. Miceli* (2002) 104 Cal.App.4th 256, 272; *People v. Mitchell* (1988) 199 Cal.App.3d 300, 302, fn. 2; see *People v. McDaniel* (2008) 159 Cal.App.4th 736, 747-748 [simple assault is lesser included offense of aggravated assault and assault by prisoner].)

Appellant argues on appeal that the jury should have been instructed on simple assault as a lesser included offense, because the jury could reasonably have concluded from the evidence that although appellant assaulted Donald and Melissa, the evidence was insufficient to show that he used a gun in the assaults. He points to a question submitted by the jury during its deliberations, asking the court whether the charge of assault with a firearm required that the defendant "used" the firearm to injure the victim, or only that the firearm was "present" at the assault. The jury returned its verdicts shortly after it was told by the court (with the approval of counsel for both parties) that the firearm's "mere presence" was not sufficient to support the charge, but proof that the firearm was "used to inflict injury" was not required.

Appellant argues that this question indicates the jury's doubts about whether a firearm played anything more than a peripheral role in the assault, indicating that it might have convicted him of simple assault, rather than assault with a firearm, if they had been

given that opportunity. Respondent counters that no evidence supports the theory that appellant did not use a gun. Although Donald saw no gun, appellant's blows felt as though they were inflicted by a gun; and Melissa testified that she saw appellant with a gun, and her injuries could not have been inflicted by fists alone.

We decline to address whether the evidence did or did not impose a duty on the court to give the jury the lesser-included-offense instruction. Even assuming that the court had such a duty, any error in failing to instruct the jury on the lesser included offense was necessarily harmless by any standard. This is because the jury not only found appellant guilty of assault with a firearm as to counts 1 and 2, but also independently found that appellant "personally used a firearm" in committing the offenses. (§ 12022.5, subd. (a).)

Because appellant "personally used a firearm" in committing the assaults, he was necessarily guilty of assault with a firearm, rather than simple assault. The independent findings that appellant "personally used a firearm" in his assaults of Donald and Melissa negate any possibility that it might also have found that he *did not* actually use a firearm. They are incompatible with the contention that the jury might have convicted appellant of simple assault rather than assault with a firearm if it had been instructed on assault as a lesser included offense. The court's failure to instruct that it was entitled to reach such a finding therefore necessarily was of no consequence to the verdicts.

## III. Appellant's Sentence Does Not Inflict Cruel And Unusual Punishment.

Appellant contends (for the first time on appeal) that his sentence of 81 years to life in prison under the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12), is so grossly disproportionate to his offenses that it amounts to cruel and unusual punishment under the Constitutions of the United States and the State of California.[7] In light of his long history of violent crime, we conclude that appellant's sentence of 81 years to life

---

[7] Appellate courts have the authority to determine whether a sentence results in cruel or unusual punishment, notwithstanding an appellant's failure to address the claim in the trial court. (*People v. Meeks* (2004) 123 Cal.App.4th 695, 706 [citing cases].)

14

imprisonment does not constitute cruel or unusual under the state or federal Constitutions.

California's Three Strikes law provides for enhancements of prison terms for new offenses because of prior prison terms. It requires a term of life imprisonment with a minimum term of at least 25 years for a conviction of a third felony after two or more prior convictions for what are defined by statute as "violent" or "serious" felonies. (§§ 667.5, 1192.7, subd. (c).) Under section 667.5, subdivision (c)(8), a "violent" felony includes any felony in which the defendant inflicts great bodily injury on any person other than an accomplice, which has been charged and proved as provided for in sections 12022.7 or 12077.9, and any felony in which the defendant uses a firearm, which use has been charged and proved as provided in section 12022.5. Under section 1192.7, subdivision (c)(8), a "serious" felony includes any felony in which the defendant personally uses a firearm. (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1505, fns. 1, 2, 3, 1511.)

Appellant was convicted of two counts of assault with a firearm (§ 245, subd. (a)(2)), and two counts of battery causing serious bodily injury (§ 243, subd. (d)). He was found to have inflicted great bodily injury on his two victims, using a firearm. (§§ 12022.7, subd. (a), 12022.5, subd. (a).) He had been found to have a long history of serious felonious conduct, having sustained two prior serious or violent felony convictions for carjacking and robbery, and at the time of the current offenses he was on parole for felony possession of a firearm. As the trial court explained, appellant is "someone who is in that pattern of the revolving door of the criminal justice system," justifying imposition of the additional penalties for recidivism. "Back in 1998 when he suffered both of the prior strike convictions [under the Three Strikes law], he was sentenced to nine years in the state prison. Upon being paroled from that, he picked up a new misdemeanor conviction in 2005. Then in 2007, he picked up two separate felony cases" (one involving furnishing a controlled substance, the other for possession of an assault weapon and ammunition by a felon). "[A]nd he did four years in state prison back in 2007 on that firearm case, and then of course picked up this new case today."

The trial court found that appellant's crimes demonstrate "a high degree of cruelty, viciousness or callousness." His victims, the Howards, "were basically ambushed" by appellant. They were attacked without provocation or warning while they "were in a particularly vulnerable state."

Selecting count 2 (the assault on Melissa) as the base term, the court imposed a total sentence on that count of 49 years to life in prison. Its sentence on that count consisted of a life term with a minimum parole eligibility of 25 years under section 667, subdivisions (b) through (i), and section 1170.12, subdivisions (a) through (d); a consecutive 10-year sentence, the high term under section 12022, based on the circumstances of the crime (involving great violence, the fact and threat of great bodily harm, a high degree of cruelty, viciousness or callousness, the victims' vulnerable state, and the defendant's danger to society); an additional consecutive sentence of three years under section 12022.7, subdivision (a); two additional consecutive five-year terms under section 667, subdivision (a);[8] and an additional one-year consecutive sentence for his previous prison term for possession of a firearm by a felon (former § 12021, subd. (a)(1)). The court struck the firearm enhancement with respect to appellant's other prior felony conviction.

For count 1 (the assault on Donald), the court sentenced appellant to a total of 32 years to life in prison, consisting of a life term with a minimum parole eligibility of 25 years under section 667, subdivisions (b) through (i), and section 1170.12, subdivisions (a) through (d); an additional four-year consecutive sentence, the midterm under section 12022; and an additional three-year consecutive sentence under section 12022.7, subdivision (a).[9]

---

[8] Section 12022.7, subdivision (a) requires the additional and consecutive term of three years for the infliction of great bodily injury in the commission of a felony. Section 667, subdivision (a), requires an additional and consecutive term of five years for each prior conviction for a serious felony, as defined in section 1192.7, subdivision (c).

[9] For each of counts 4 and 5 the court imposed sentences of 25 years to life, with four years of enhancements, but stayed those sentences under section 654.

16

The cruel and unusual punishment clause of the United States Constitution's Eighth Amendment provides that "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The California Constitution also provides that "Cruel or unusual punishment may not be inflicted." (Cal. Const. art. I, § 17.) "'Whether a punishment is cruel and unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment.'" (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358.)

A sentence violates these constitutional prohibitions only if it is grossly disproportionate to the defendant's crime, in light of both the circumstances of the current offense or offenses and the defendant's history as a recidivist offender. In *Rummel v. Estelle*, *supra*, 445 U.S. 263 (*Rummel*), the United States Supreme Court held that society is warranted in imposing increasingly severe penalties on recidivist offenders. A recidivist sentencing statute's primary goals "are to deter repeat offenders and, at some point in the life of one who repeatedly commits criminal offenses serious enough to be punished as felonies, to segregate that person from the rest of society for an extended period of time." (*Id.* at pp. 284-285; *Ewing v. California* (2003) 538 U.S. 11, 29.) California courts have adopted this reasoning in upholding life sentences for third strike offenders. (*People v. Martinez*, *supra*, 71 Cal.App.4th at p. 1511.)

In determining whether a particular sentence under a recidivist sentencing statute such as the Three Strikes law is unconstitutionally excessive or disproportionate to the defendant's crime, the reviewing court determines whether the sentence constitutes cruel and unusual punishment "as applied to the specific circumstances involved in the case at issue." (*In re Coley* (2012) 55 Cal.4th 524, 553, italics omitted.) The reviewing court considers three criteria: the gravity of the offense and the harshness of the penalty; the sentence imposed on other offenders in the same jurisdiction; and the sentences imposed for the same crime in other jurisdictions. (*In re Lynch* (1972) 8 Cal.3d 410, 425; *People v. Meeks*, *supra*, 123 Cal.App.4th at p. 707.)

Appellant argues that his sentence is harsh by suggesting that his release during his lifetime is unlikely, due to his age and the number of his current and prior serious

17

felony offenses. But appellant does not address the claimed harshness of the sentence in the context of the number and severity of the crimes for which he was convicted, or his history of prior violent and serious felony offenses—the factors that justify the state's imposition of increasingly severe penalties on offenders who repeatedly commit serious criminal offenses. (*Ewing v. California*, *supra*, 538 U.S. at p. 29; *People v. Martinez*, *supra*, 71 Cal.App.4th at p. 1511.) Nor does appellant suggest that his sentence is harsher than those imposed on other offenders in this state for similarly violent and serious offenses, or harsher than sentences imposed in other jurisdictions for such repeated felony offenses. (See *In re Lynch*, *supra*, 8 Cal.3d at p. 425; *People v. Meeks*, *supra*, 123 Cal.App.4th at p. 707.)

Viewed in the light most favorable to the judgment, appellant was convicted using a handgun to beat two defenseless victims with a handgun, in the dark and without provocation or warning, causing severe head wounds to one victim and knocking the other unconscious with his blows. He was sentenced for those offenses based on his status as a repeat offender, having been convicted of carjacking and more recently for being a felon in possession of a firearm, an offense for which he was on parole at the time of the current offenses. On this record, appellant's sentence does not violate the prohibitions against cruel and unusual punishments of the California or United States constitutions.

## IV.  Amendment Of The Abstract Of Judgment To Correct Clerical Errors.

The respondent's brief asks that we order modification of the abstract of judgment in this case in two respects: (1) to correct a clerical error regarding the statutory scheme under which appellant was sentenced; and (2) to correct a clerical error regarding the statutory scheme under which appellant was awarded presentence credits. Appellant's reply brief does not address these requests. Clerical errors in the record may be corrected by trial or appellate courts at any time. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185, 187-188.)

Respondent asks that the abstract of judgment be corrected to reflect that appellant was sentenced under the Three Strikes law, section 667, subdivisions (b) through (i), and

18

section 1170.12, by checking the corresponding box at Item 8 of the Abstract of Judgment, page 1. This correction is justified by the trial court's specific references in its sentencing statement to the applicable provisions of law.

Respondent asks also that the abstract of judgment be corrected to reflect that the trial court awarded appellant presentence conduct credits under section 2933.1, which provides that a person convicted of a felony listed in subdivision (a) of section 667.5 (encompassing the violent felonies for which appellant was convicted) "shall accrue no more than 15 percent of worktime credit, as defined in Section 2933." The trial court's application of the 15 percent limitation of section 2933.1, justifying the requested correction in the abstract of judgment, is shown by its grant of 258 days of credit, "plus 38 days of good time/work time credits, for a total of 296 days of presentence custody credit"—constituting 15 percent of 258, rounded to the nearest whole number.

### Disposition

The judgment is affirmed. The Abstract of Judgment is ordered corrected as follows: (1) to reflect that appellant was sentenced under the Three Strikes law, section 667, subdivisions (b) through (i), and section 1170.12, by checking the corresponding box at Item 8 of the Abstract of Judgment, page 1; and (2) to insert a mark in row A of Item 15 of the Abstract of Judgment, page 2, indicating the conduct credits are calculated under section 2933.1.

NOT TO BE PUBLISHED.

CHANEY, Acting P. J.

We concur:

JOHNSON, J.

BENDIX, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.