Filed 2/26/15  Ramos-Lovato v. Community Bank CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| JOSE RAMOS-LOVATO, | |
| Plaintiff and Appellant, | E055920 |
| v. | (Super.Ct.No. SCVSS131901) |
| COMMUNITY BANK, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Frank Gafkowski, Jr., Judge.  Affirmed.

Walker, Wright, Tyler & Ward and Richard W. Eckardt for Plaintiff and Appellant.

Manatt, Phelps & Phillips, Barry W. Lee, Craig S. Bloomgarden, Benjamin G. Shatz, and Diana I. Iorlano for Defendant and Appellant.

1

## I.  INTRODUCTION

This case involves two appeals.  Defendant and appellant Community Bank (the Bank) appeals the judgment awarding its landlord, plaintiff and appellant Jose Ramos-Lovato (plaintiff), $1,047,250 in attorney fees and costs as the prevailing party on his contractual claims against the Bank for breaching a lease on a building.  (Civ. Code, § 1717.)  Plaintiff defends the award and appeals from the judgment dismissing his tort cause of action against the Bank for conversion.  The court granted the Bank's motion in limine for judgment on the pleadings and dismissed the conversion claim on the ground it was not independent of plaintiff's breach of lease claims.

After the building was destroyed by fire in January 2004, plaintiff sued the Bank for breaching the lease in several respects, including failing to pay rent and property taxes through the end of the lease term, failing to carry all risk insurance on the building, failing to use insurance proceeds the Bank received to rebuild and restore the building, and failing to rebuild and restore the building.  Plaintiff also sued the Bank for negligence in causing the fire and for converting insurance proceeds to its own use and benefit rather than using them to rebuild and restore the building as the lease required.  Plaintiff sued four other defendants to recover the replacement cost of the building.

On its appeal, the Bank claims the court used an improper legal standard in determining the fee award, the court erroneously failed to deduct or apportion fees and costs attributable to plaintiff's nonlease or nonfee claims, and the award should have been limited to fees and costs plaintiff incurred in pursuing his claim for unpaid rent and

property taxes. Had the award been properly limited, the Bank argues, it should not have exceeded $235,110. For his part, plaintiff claims his conversion claim alleged tortious conduct by the Bank *independent* of the Bank's breaches of the lease, and must be reinstated. We reject each party's claims and affirm the judgment in its entirety.

## II. FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual Background*

In September 2003, plaintiff purchased a building in San Bernardino that the Bank had been leasing since 1985, and plaintiff succeeded to the prior owner's interest in the lease. The "triple net" lease was to expire on December 31, 2004, but the building was destroyed by fire on January 26, 2004. The lease required the Bank to carry "all risk" insurance on the building and its interior improvements, name plaintiff as "loss-payee," use the insurance proceeds to rebuild and restore the building, and continue paying rent, real property taxes, and other charges through the end of the lease term. The Bank had no right to terminate the lease or stop paying rent and other charges, even though the building was completely destroyed.

The Bank did not have all risk insurance when plaintiff purchased the property in 2003 or when the building was destroyed by fire in January 2004. During his escrow for the purchase of the property, plaintiff's lender required him to obtain "lessor's risk" or "forced place" insurance so the loan would be paid if the building was damaged or destroyed. After the escrow closed, plaintiff demanded that the Bank obtain all risk

3

insurance and reimburse him for the $1,629 premium he paid for the forced place policy he purchased from AMCO Insurance Company (AMCO).

In September 2003, the Bank purchased insurance for the interior improvements and furnishings from Federal Insurance Company (Federal), but still did not obtain all risk insurance covering the building, and the Bank's policy with Federal did not name plaintiff as the "loss payee." Because the Bank's insurance policy with Federal did not comply with the terms of the lease, plaintiff again demanded that the Bank purchase all risk insurance in a January 22, 2004, letter. The fire occurred only days later, on January 26, 2004.

In May 2004, the Bank notified plaintiff it was terminating the lease and stopped paying rent and real property taxes effective June 1, 2004. In late June 2004, after it purported to terminate the lease, the Bank received $716,074 in insurance proceeds from Federal but did not use any of the proceeds to rebuild the building, and did not pay any of the proceeds to plaintiff. The Bank and Federal agreed that $253,360 of the $716,074 amount was the value of the interior improvements lost in the fire (e.g., ceiling tile, carpet, and cabinets), and $462,714 was the value of the personal property the Bank lost in the fire (e.g., artwork, desks, and computers).

Shortly after the Bank terminated the lease in May 2004, plaintiff received a "short changed claims payment" of $212,000 from AMCO which covered his outstanding loan

4

balance. In July 2005, plaintiff sold the property, including the burned-out building, for $950,000.[1]

B. *Plaintiff's Lawsuit Against the Bank and Other Defendants*

In December 2004, plaintiff filed suit against three defendants, including the Bank. In November 2006, plaintiff filed his operative second amended complaint alleging 14 causes of action against five defendants. Against the Bank, plaintiff alleged causes of action for breach of contract (the lease), conversion, and negligence.

Plaintiff's breach of lease claims were based on the Bank's failure to (1) pay rent and property taxes through December 2004, (2) obtain all risk insurance coverage, (3) pay, hold in trust for plaintiff, or use the insurance proceeds the Bank received from Federal to rebuild and restore the building, and (4) rebuild and restore the building. Plaintiff's conversion claim alleged the Bank converted part of the insurance proceeds it received from Federal to its own use, rather than use the proceeds to rebuild and restore the building as the lease required. Plaintiff's negligence claim alleged the Bank was partly responsible for causing the fire.

The second amended complaint alleged additional causes of action against (1) plaintiff's insurer, AMCO, for breach of insurance contract and bad faith, (2) the Bank's

---

[1] Plaintiff has requested that this court take judicial notice of a public record, San Bernardino County Assessor Taxable Value List, purportedly showing the tax assessed value of the bank building and land on June 21, 2003. The Bank opposes the request on several grounds, and we deny it because neither the tax-assessed nor the fair market value of the property, at any time, is relevant to the issues on appeal. (See, e.g., *Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1529-1530, fn. 7.)

insurer, Federal, for reformation of insurance contract and bad faith, (3) the Bank's insurance broker, Financial Guaranty Insurance Brokers, Inc. (FGIB), for professional errors and omissions, and (4) the building's janitorial service, Diversified Maintenance Services (DMS), for negligence in causing the fire, along with the Bank.

C. *The Bifurcated Trial and Settlements*

In September 2009, plaintiff moved to sever his negligence claims against the Bank and DMS from the rest of the case. The motion was granted and the court ordered trial to proceed in two phases: Phase I, on plaintiff's negligence claims against the Bank and DMS, and Phase II, on plaintiff's breach of lease and conversion claims against the Bank, and plaintiff's additional claims against AMCO, Federal, and FGIB.

A jury trial on plaintiff's negligence claims against the Bank and DMS was held over 15 days in October and November 2009. The jury returned a verdict finding the Bank 75 percent and DMS 25 percent negligent in causing the fire, and liable to plaintiff in the same proportions for the $725,000 cost of rebuilding the building, plus prejudgment interest, for a total jury award of $1,016,812.50.

In February 2010, over the Bank's opposition, Federal settled plaintiff's Phase I jury verdict against the Bank and plaintiff's Phase II claims against Federal by paying plaintiff $800,000 to release his negligence claims against the Bank and $175,000 to release his Phase II claims against Federal. The agreement released the Bank and Federal from any and all liability for plaintiff's claims arising from the fire, but did not release the Bank from plaintiff's conversion or breach of lease claims. The other defendants,

DMS, AMCO, and FGIB, separately settled plaintiff's Phase II claims against them.  By mid-2010, plaintiff's only unsettled claims were his conversion and breach of lease claims against the Bank, to be tried in Phase II.

D.  *Plaintiff's Phase II Claims Against the Bank for Conversion and Breach of the Lease*

In February 2011, the Bank stipulated with plaintiff that it breached the lease by failing to pay rent and real property taxes through December 2004.  The Bank paid plaintiff $108,427.60, including prejudgment interest, for the unpaid rent and real property taxes, but continued to deny it breached the lease in any other respect.

On the eve of Phase II of the trial in June 2011, the Bank filed a motion in limine for judgment on the pleadings on plaintiff's conversion cause of action.  The Bank argued the conversion claim was not independent of the Bank's alleged breach of the lease in failing to apply the $253,360 of the insurance proceeds the Bank received from Federal for the interior improvements, because plaintiff was alleging the lease required the Bank to apply these proceeds toward rebuilding and restoring the building.  The trial court agreed the conversion claim did not allege a tort *independent of* the Bank's lease obligation, and granted the motion.

Following the dismissal of plaintiff's conversion claim against the Bank, plaintiff and the Bank agreed, and the court later found, that the dismissal of the conversion claim "effectively terminat[ed] the Plaintiff's action against [the Bank]."[2]  Thus, following the

---

[2]  Ostensibly, through his settlement agreements with Federal and the other defendants, plaintiff recovered substantially all of the replacement cost damages he incurred as a result of the Bank's failure to have all risk insurance and rebuild and restore

*[footnote continued on next page]*

7

dismissal of his conversion claim, plaintiff did not proceed on his remaining breach of lease claims against the Bank, but filed a motion to recover his attorney fees and costs from the Bank pursuant to the attorney fee clause in the lease.

E. *Plaintiff's Motion for Attorney Fees and Costs*

The lease required the Bank, as lessee, to pay the lessor "reasonable attorney's fees which shall be fixed by the court" in the event the lessor filed suit for breach. (Civ. Code, § 1717.) Plaintiff's original motion for attorney fees sought $2,051,555.67 in attorney fees and costs from the Bank. The Bank opposed the motion and filed a motion to tax costs. Plaintiff opposed the motion to tax costs and submitted supplemental declarations.

In October 2011, the court issued its first of two tentative decisions on plaintiff's supplemented motion for attorney fees and costs and the Bank's motion to tax costs. Following an October hearing, the court requested additional briefing; plaintiff submitted additional documentation; and the Bank filed a response. In his supplemental submissions, plaintiff reduced his total request to $1,069,322.96.

In January 2012, the court issued a 26-page revised tentative decision indicating its intent to award plaintiff $1,047,250.49 in attorney fees and costs, around $1 million less than he originally sought and $22,072.47 less than he requested in his supplemental

---

*[footnote continued from previous page]*
the building. As noted, the jury in Phase I found $725,000 was the cost of rebuilding and restoring the building, and plaintiff received more than this amount through his settlement with Federal.

8

briefing. The Bank objected on the ground the proposed award was not limited to the fees and costs plaintiff incurred in pursuing his breach of lease claim for unpaid rent and property taxes, and improperly included fees and costs plaintiff incurred in pursuing his negligence, conversion, and "unadjudicated" breach of lease claims against the Bank and his claims against the other defendants. The Bank argued its only breach of the lease was its failure to pay rent and real property taxes through December 2004, and it settled that claim in February 2011.

Following a January 20, 2012, hearing, the court adopted its revised tentative as its order and statement of decision, and entered judgment for plaintiff and against the Bank in the amount of $1,047,250.49, comprising $994,795.10 in fees and $52,455.39 in costs. On March 7, 2012, the court corrected the judgment nunc pro tunc to include judgment in favor of the Bank on plaintiff's cause of action for conversion.

In its statement of decision, the court found plaintiff was the prevailing party on all of his breach of lease claims against the Bank, and found the Bank breached the lease by failing to carry "all risk" insurance on the building; name plaintiff as loss-payee; pay rent and other charges after the building was destroyed by fire; use all available insurance proceeds to rebuild and restore the building; and rebuild and restore the building. The court found plaintiff "clearly prevailed on every cause of action in his Second Amended Complaint" "but for [his] sole cause of action for conversion of insurance proceeds" against the Bank.

9

The judgment states the court awarded the fees and costs to plaintiff because "all of the actions against [the] other defendants *arose from* the breaches of the lease on the part of [the] Bank [and] those [other] actions . . . would not have been necessary, *but for* the Bank's failure to honor its obligations under the . . . lease . . . ." (Italics added.) The statement of decision elaborates: "All the facts and legal services in this case are intertwined to the Lease and the Bank's conduct. While Plaintiff had [negligence] causes of action against [the] Bank and DMS for the cause of the fire, insurance breach of contract and [a] bad faith cause of action against Federal and AMCO as well as [his] claims against [FGIB], these causes of action only *arose out* of the failure of the Bank to have the required insurance for the benefit of its landlord [plaintiff] as required by the Lease." (Italics added.) The court found plaintiff "was forced to litigate this case to obtain the replacement cost damages which he would have been entitled to receive had [the] Bank provided full replacement cost insurance coverage as required by the Lease, and/or repaired and restored the building as required by the Lease"; and the "[l]itigation against [the other defendants] would not have been required . . . *if* [the] Bank had in fact [complied with the lease]."

Still, the court excluded from the award numerous items of fees and costs plaintiff incurred in the action. To cite a single but significant example, the court excluded all the fees of plaintiff's trial counsel, Messrs. Echeverria and Eckardt, charged for their "Phase I trial time," including all of the fees they charged following the 50-day pretrial cut-off date for designating experts (Code Civ. Proc., § 2034.230) prior to the Phase I trial, and

10

all of the fees they charged for conducting the Phase I trial in which plaintiff prevailed on his negligence claim against the Bank and DMS. The court also excluded virtually all of the travel time plaintiff's attorneys charged during the seven-year-long litigation. In sum, the statement of decision shows the court painstakingly reviewed plaintiff's requested fees and costs, and excluded from the award—to the extent practical—all items of fees and costs unrelated to plaintiff's breach of lease claims.

### III. ANALYSIS/THE FEE AND COST AWARD

The Bank claims the award of $1,047,250.49 in attorney fees and costs to plaintiff was excessive because (1) the court applied an incorrect legal standard in concluding it was not required to apportion any of the requested fees and costs to plaintiff's nonlease claims against the Bank for negligence and conversion, or his claims against the other defendants; (2) the award should have been limited to the fees and costs plaintiff incurred in pursuing his claim against the Bank for unpaid rent and real property taxes; and (3) certain fees and costs should have been excluded from the award. We find no legal error or abuse of discretion in the court's analysis of the issues or in the award.

A. *Applicable Legal Principles and Standard of Review*

Civil Code section 1717 provides: "(a) In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract . . . shall be entitled

11

to reasonable attorney's fees in addition to other costs. [¶] . . . [¶] Reasonable attorney's fees shall be fixed by the court, and shall be an element of the costs of suit."

Attorney fees are not recoverable under Civil Code section 1717 if they are incurred in connection with claims unrelated to the contract: "Where a cause of action based on the contract providing for attorney's fees is joined with other causes of action beyond the contract, the prevailing party may recover attorney's fees under [Civil Code] section 1717 only as they relate to the contract action. [Citations.] . . . A litigant may not increase his recovery of attorney's fees by joining a cause of action in which attorney's fees are not recoverable to one in which an award is proper." (*Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129.)

Nonetheless, the joinder of contractual claims with other claims in an action does not "dilute" the prevailing party's right to recover fees related to the enforcement of the contract, pursuant to Civil Code section 1717. (*Reynolds Metals Co. v. Alperson, supra,* 25 Cal.3d at p. 129.) As *Reynolds* explained: "Attorney's fees need not be apportioned when incurred for representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed." (*Id.* at pp. 129-130.) In this event, "'[a]ll expenses incurred with respect to the [issues common to all cause of action] qualify for award.'" (*Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1604, quoting *Reynolds Metals Co. v. Alperson, supra,* at p. 130.)

Thus, allocation or apportionment of fees among contractual and other claims "is not required when the issues are 'so interrelated that it would have been impossible to

12

separate them into claims for which attorney fees are properly awarded and claims for which they are not.'" (*Amtower v. Photon Dynamics, Inc., supra,* 158 Cal.App.4th at p. 1604, quoting *Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1133.) """"Attorney's fees need not be apportioned between distinct causes of action where [the] plaintiff's various claims involve a common core of facts or are based on related legal theories." [Citation.] Apportionment is not required when the issues in the fee and nonfee claims are so inextricably intertwined that it would be impractical or impossible to separate the attorney's time into compensable and noncompensable units.' [Citation.]" (*Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407, 417, fn. omitted (*Harman*).)

The trial court has considerable discretion to determine whether fees should be apportioned among fee and nonfee claims: "Where fees are authorized for some causes of action in a complaint but not for others, allocation is a matter within the trial court's discretion. [Citation.] A trial court's exercise of discretion is abused only when its ruling """"exceeds the bounds of reason, all of the circumstances before it being considered."""" [Citations.]" (*Amtower v. Photon Dynamics, Inc., supra,* 158 Cal.App.4th at pp. 1602-1605 [trial court reasonably declined to apportion fees to noncontract claims when factual allegations overlapped and there was "no clear line of demarcation" between the claims]; *Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 555-556 [trial court reasonably concluded additional allocation of fees to noncontract

claims was not required because the issues were intertwined and "there was no precise methodology" the court could use to further apportion the fee request].)

Additionally, Civil Code section 1717 provides for payment of a "reasonable" fee, and the court has discretion to determine what constitutes a reasonable fee in the case. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095-1096.)  In determining what constitutes a reasonable fee, the court considers "'a number of factors, including the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the case.'  [Citation.]" (*Id*. at p. 1096.)

On appeal, "'"'[w]e review the entire record, attentive to the trial court's stated reasons in denying [or granting] the fees and to whether it applied the proper standards of law in reaching its decision. . . ." [Citation.]'  [Citation.]  'If it did, we then determine whether the application of that standard to the facts was within the scope of its discretion . . . .' [Citations.]  We defer to the trial court's discretion 'because of its "superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." [Citation.]'  [Citation.]" (*Harman, supra,* 158 Cal.App.4th at p. 418.)  "The 'experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong.'  [Citations.]" (*Serrano v. Priest* (1977) 20 Cal.3d 25, 49.)

14

B. *Analysis*

The Bank first argues the court applied an incorrect legal standard in determining the award, and the de novo standard applies in reviewing this legal error. (*In re Charlisse C.* (2008) 45 Cal.4th 145, 159 [de novo standard applies in reviewing trial court's conclusions of law].) Rather than determine whether plaintiff's lease-related claims were *inextricably intertwined* with his other claims against the Bank and the other defendants, the Bank argues the court applied an erroneous "but for" or "arising from" standard. The Bank argues this "but for" test was "far broader" than the inextricably intertwined standard required by law, and resulted in an award "many hundreds of thousands of dollars too high."

We disagree with the Bank's characterization of the court's analysis. Though the judgment states that "all of the actions against [the] other defendants *arose from* the breaches of the lease on the part of [the] Bank [and] those [other] actions . . . would not have been necessary, *but for* the Bank's failure to honor its obligations under the . . . lease" (italics added), and the statement of decision similarly states that plaintiff's claims against the other defendants "only *arose out of* the failure of the Bank to have the required insurance for the benefit of its landlord [plaintiff] as required by the [l]ease" (italics added), the court's use of the "but for" and "arose out of" phrases was just another way of saying the claims were inextricably intertwined, and no apportionment of fees among the plaintiff's breach of lease and other claims was necessary or practical. Indeed, in its statement of decision, the court both clearly stated and properly applied the correct,

15

*inextricably intertwined* legal standard in concluding it was not required to apportion fees to plaintiff's nonfee claims.

As the court explained in its statement of decision, and as the record shows, plaintiff "was forced to litigate this matter against multiple parties on multiple different theories for years to obtain what he was entitled to receive under the lease. *Each cause of action which* [*plaintiff*] *pursued was related to and intertwined with* [*the*] *Bank's multiple breaches of the lease*. A determination of the cause and origin of the fire as between [the] Bank and DMS would have been unnecessary for [plaintiff] to be made whole had he been fully compensated by insurance or [the] Bank for the full replacement value of the building as required by the lease. Additionally, the determination of the full replacement value of the bank building in Phase I of the trial was interrelated and relevant to a determination of the amount of insurance for the full replacement value of the bank building or [the] Bank's obligation to rebuild which was required under the lease. [¶] Litigation against Federal or FGIB and AMCO would not have been required by [plaintiff] if [the] Bank had in fact provided [plaintiff] with the full replacement value insurance, or rebuilt or restored the building as required by the lease. The reason litigation with the insurance defendants was required was because [the] Bank failed to deliver all risk full replacement value insurance coverage as required by the lease. [¶] The breach of the lease by [the] Bank permeated the entire litigation. . . ." (Italics added.)

Thus, contrary to the Bank's argument, the court did not decline to apportion fees to plaintiff's nonfee claims simply because the nonfee claims would not have arisen *but*

16

*for* the Bank's several breaches of the lease. Instead, the court properly concluded it was not required to apportion fees to nonfee claims because the nonfee claims were inextricably intertwined with plaintiff's fee claims against the Bank for its breaches of the lease, including its failure to purchase all risk insurance and rebuild and restore the building.

Further, the court's determination that the fee and nonfee claims were inextricably intertwined, "'making it "impracticable, if not impossible, to separate the multitude of conjoined activities into compensable or noncompensable time units"'" (*Harman, supra,* 158 Cal.App.4th at p. 424) is amply supported by the evidence in the record. As the court explained, the case was "vigorously litigated" by all defendants; "[p]laintiff was subjected to motions for summary judgment and had to contend with extensive law and motion matters, and then proceed to Phase I [of the trial]." Plaintiff's attorneys "were required during the duration of the entire litigation to attend to legal machinations by other players in order to protect [plaintiff's] own contract and tort pursuits against [the] Bank," and "[p]laintiff's attorneys themselves have eliminated alleged 'side-track' [or 'collateral'] attorney fee claims." The court thus reasonably concluded that no apportionment of fees to nonfee claims was required, or had already been made.

The Bank argues the fee and nonfee claims shared no common issues of fact because, for example, the nonfee claims against the insurance defendants were "based solely on their alleged separate and independently wrongful conduct." The Bank argues plaintiff's claim against his "forced place" insurer, AMCO, "rested on [AMCO's]

17

independent breach of its insurance policy and bad faith refusal to pay benefits for the full replacement cost of the building," while the lease between plaintiff and the Bank "was factually and legally irrelevant to any aspect of [p]laintiff's claims against AMCO." The Bank also points to other fees it claims should have been excluded from the award, including fees plaintiff incurred for communications "throughout the lawsuit" between his counsel and counsel for the other defendants, reviewing motions and preparing oppositions "related to other defendants," and deposing and reviewing deposition transcripts "for witnesses related to other defendants."

The Bank's arguments ignore the many common issues of fact underlying the fee and nonfee claims, and the impracticality of apportioning or segregating the fees and costs plaintiff incurred in pursuing the Bank for its breaches of the lease, from the fees and costs plaintiff incurred in pursuing his other claims. As the court found, "[n]ot only [did the Bank] *expressly admit*[] in open court to breach of the [l]ease as to the issue of past due rents and taxes[,] but the entire case is inextricably intertwined with the multiple breaches of the [l]ease for failure to provide full replacement cost insurance, apply insurance proceeds to [plaintiff], and rebuild and restore the building by [the] Bank. [Plaintiff's] entire lawsuit was necessitated to recover what was rightfully owed to [plaintiff] by the Bank under the [l]ease." As the court also pointed out, "the determination of the full replacement value of the bank building in Phase I of the trial was interrelated and relevant to a determination of the amount of insurance for the full

18

replacement value of the bank building or [the] Bank's obligation to rebuild which was required under the lease."

The Bank relies on *Harman, supra,* 158 Cal.App.4th 407 for the proposition that apportionment is necessary unless the prevailing party's contractual and other claims "share a 'common core of facts *and* legal theories'. . . ." (Italics added.) This misrepresents *Harman*. *Harman* pointed out that "although '"there is no certain method of determining when claims are 'related' or 'unrelated,'"' the essential inquiry is 'whether the "different claims for relief . . . are based on different facts *and* legal theories." [Citation.] If so, they qualify as unrelated claims. Conversely, related claims "will involve a common core of facts *or* will be based on related legal theories." [Citation.]'" (*Id.* at p. 423, italics added.) *Harman* thus recognized that claims may be related, and no apportionment is required, if the claims share common issues of fact *or* are based on related legal theories. (See also *Maxim Crane Works, L.P. v. Tilbury Constructors* (2012) 208 Cal.App.4th 286, 296-300 [fees incurred in pursing contractual indemnity claim inextricably intertwined with fees incurred in investigating personal injury suit for which indemnity was sought].)

The Bank also relies on *McKenzie v. Kaiser-Aetna* (1976) 55 Cal.App.3d 84, 88 and 89 for the proposition that plaintiff's claims were not all "inextricably intertwined" because they were "not the same cause of action under different guises." But as the trial court pointed out in its statement of decision, the Bank "greatly overstates the ruling in *McKenzie*." In *McKenzie,* a jury returned a general verdict awarding the plaintiff a net

19

monetary recovery against the defendant and cross-complainant Kaiser-Aetna, but the verdict did not specify which of the plaintiff's various theories of recovery it was based on: breach of contract, breach of negligent misrepresentation, or breach of implied warranty. (*Id*. at pp. 86-88.) The trial court denied McKenzie's request for attorney fees because he did not meet his burden of showing the verdict was based on his breach of contract claim. (*Id*. at pp. 87-88.)

In affirming the judgment, the *McKenzie* court reasoned: "The net verdict and judgment were in [McKenzie's] favor, but there is no way to ascertain, in the absence of special jury findings, on which of the theories of recovery (breach of contract, negligent misrepresentation, or breach of implied warranty) the jury mainly based its award to [McKenzie]. Those theories do not all call for identical determinations of fact . . . . The three theories of recovery were thus not merely the same cause of action under different guises. It is thus necessary to determine whether all those causes of action were 'action[s] on [the] contract,' as that phrase is used in Civil Code section1717." (*McKenzie v. Kaiser-Aetna, supra,* 55 Cal.App.3d at pp. 88-89, italics added.) In sum, because the entire verdict could have been based on McKenzie's negligence, claim, McKenzie could not recover his attorney fees under Civil Code section 1717. (*McKenzie v. Kaiser-Aetna, supra,* at p. 89.)

As the trial court observed in its statement of decision, *McKenzie* does not support the Bank's argument that various theories of recovery must be "the same cause of action under different guises" in order to be inextricably intertwined. Rather, in using the

quoted phrase, the court was only pointing out that McKenzie did not meet his burden of showing he prevailed on his breach of contract claim. Indeed, *McKenzie* did not address whether the plaintiff's breach of contract claims were "inextricably intertwined" with his nonfee claims. (*McKenzie v. Kaiser-Aetna, supra,* 55 Cal.App.3d at pp. 88-89.)

The present case is also unlike *Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265, which involved attorney fees that were readily and fairly allocable among several defendants. The plaintiffs in *Heppler* sued a developer for construction defects, and the developer cross-complained against several subcontractors for indemnity. (*Id*. at p. 1273.) After the developer assigned its indemnity rights to the plaintiffs as part of a settlement, the plaintiffs proceeded to a seven-week trial against four of the subcontractors. (*Id*. at pp. 1273-1274, 1297.) The jury found in favor of all but one of the subcontractors, Martin, and the trial court ordered Martin to pay the plaintiffs' attorney fees for the entire seven-week trial, pursuant to Civil Code section 1717. (*Heppler v. J.M. Peters Co., supra,* at pp. 1274, 1293, 1296.) On appeal, the court reversed the fee award and remanded the matter to determine the amount of fees that "should [have been] properly allocated against Martin." (*Id*. at pp. 1297-1298, fn. omitted.)

The *Heppler* court explained that it reversed the fee award because Martin bore limited responsibility for the plaintiffs' damages and trial time: "Martin's part of the case could have been tried in considerably less time than seven weeks had the trial not taken up issues that involved the other nonsettlling subcontractors. It strikes us as eminently

21

unfair to tag Martin with all of plaintiffs' attorney fees for the entire seven-week trial. [¶] . . . [¶] Not all the issues involving Martin's case were integrally associated with the other issues in the case; at the very least, some of them could have been severed and isolated for purposes of the attorney fees award. Certainly, there were multiple days of trial that were devoted exclusively to soil issues." (*Heppler v. J.M. Peters Co., supra,* 73 Cal.App.4th at p. 1297.)

In contrast to *Heppler*, the court here reasonably concluded that the fees it awarded plaintiff were not readily severable among his claims against the Bank and the other defendants. As the court explained: "Because the Bank initially failed to have the required insurance, this factor brought others into the fray and made the ensuing discovery and law and motion practice between the parties most complex. . . ." Counsel for each party appeared in "dozens of court appearances," and there were "dozens of depositions," until "the dust finally settled." "[N]o party was free from the clutches of others until just after the trial of Phase I and the [s]ettlement of [February 2010 between plaintiff and Federal]." "[U]p to the time of bifurcation of contract related matters from the negligence matters . . . there was no talk or pleadings by anyone suggesting how the complex matters would be conducted as a trial."

The Bank argues the award should have been limited to the fees and costs plaintiff incurred in pursuing the Bank for the unpaid rent and property taxes, because plaintiff's claim that the Bank breached the lease by failing to obtain all risk insurance and rebuild

the building were "unadjudicated," and plaintiff "abandoned" these claims by failing to proceed on them in Phase II of the trial. Not so.

As the court explained, plaintiff had to pursue the insurance defendants through years of litigation to obtain the benefit of the bargain he had under the lease with the Bank, including the replacement cost of the building. Moreover, the replacement cost of the building was determined during the Phase I trial against the Bank and DMS, in 2009, and once the Bank finally stipulated, in February 2011, that it had breached the lease by failing to pay rent and property taxes through December 2004, there were no further issues to be determined between plaintiff and the Bank in the Phase II trial.

The Bank further argues plaintiff's nonfee claims against the insurance defendants were "based solely on their alleged separate and independently wrongful conduct." For example, the Bank argues plaintiff's claims against his insurer, AMCO, "rested on" AMCO's "independent breach of its insurance policy and bad faith refusal to pay benefits for the full replacement cost of the building." The Bank claims the award erroneously includes $64,770.24 for fees plaintiff incurred in successfully opposing AMCO's motion for summary judgment against him, because the motion had "nothing to do" with the Bank. We disagree.

The award, including the $64,770.24 portion awarded for defending against the AMCO motion, is presumed correct on appeal (*Oliveira v. Kiesler* (2012) 206 Cal.App.4th 1349, 1362.) As the party challenging the award, the Bank had a duty to designate an adequate record on appeal to overcome this presumption and support its

23

claim that the $64,770.24 portion of the award was unauthorized because the AMCO motion involved issues unrelated to plaintiff's fee claims against the Bank. (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295 ["It is the burden of the party challenging the fee award on appeal to provide an adequate record to assess error."].) The record does not include any of the AMCO motion papers, nor does it indicate the basis of the motion. This is fatal to the Bank's claim of error regarding the $64,770.24 portion of the award.[3]

The Bank also claims the award erroneously includes fees and costs incurred in connection with the Phase I "negligence" trial against the Bank and DMS, including fees and costs for depositions, other discovery, and other services performed by plaintiff's attorneys *before* the 50-day pretrial cut-off date for designating experts (Code Civ. Proc., § 2034.230) in the Phase I trial. Again, we disagree.

On this record, we cannot say that some of plaintiff's so-called negligence-related fees and costs were not attributable to the Bank's destruction of improvements to the property and, hence, to plaintiff's breach of lease claims against the Bank. Further, the case was not bifurcated until September 2009, and before that time it was apparently impractical for plaintiff to separate negligence-related fees and costs from any fees and costs he incurred *solely* in connection with his breach of lease claims against the Bank.

---

[3] In its statement of decision, the court found that plaintiff's defense of the AMCO motion was "necessary" and recalled it issued a "complicated" tentative decision denying the motion, but the court did not discuss the basis of the motion. Addressing the reasonableness of the $64,770.24 request, the court noted that the attorney who defended against the motion, Ronald D. Kent, was a business litigation and insurance specialist whose rates were "notably higher" but reasonable for such specialists. The court noted that Mr. Kent also attended "a full day's mediation."

On this record, there was no practical distinction to be drawn between the two. As noted, apportionment of fees and costs among contractual and other claims "is not required when the issues are 'so interrelated that it would have been impossible to separate them into claims for which attorney fees are properly awarded and claims for which they are not.'" (*Amtower v. Photon Dynamics Inc., supra,* 158 Cal.App.4th at p. 1604.)

Finally, the statement of decision shows the court painstakingly reviewed the billings and costs of each of plaintiff's attorneys, and excluded many of plaintiff's fees and costs from the final award. The court noted the Bank made "much ado of the fact that there was substantial attorney time involved with some of plaintiff's matters which they call collateral," but plaintiff's attorneys had "themselves" "eliminated alleged 'side-track' attorney fee claims." In sum, we find no error of law or abuse of discretion in the court's inclusion of any of the so-called collateral items in the final award.

## IV. ANALYSIS/PLAINTIFF'S CONVERSION CLAIM

On his appeal, plaintiff claims the trial court erroneously granted the Bank's motion in limine for judgment on the pleadings on plaintiff's second cause of action against the Bank for conversion. In his complaint, plaintiff alleged the Bank converted, to its own use and benefit, insurance proceeds it received to replace interior improvements to the building, rather than pay the proceeds to plaintiff or use them to rebuild and restore the building, as the lease required. Plaintiff sought compensatory and punitive damages for the Bank's alleged tortious conduct in converting the insurance proceeds.

25

We conclude the motion was properly granted.  Contrary to plaintiff's argument, his cause of action for conversion alleged no tortious conduct by the Bank *independent of* its breaches of the lease.  As such, it did not state a cause of action in tort, and was properly dismissed in light of plaintiff's overlapping breach of lease claim.

A.  *Standard of Review*

"A motion for judgment on the pleadings is analogous to a general demurrer, but is made after the time to file a demurrer has expired."  (*International Assn. of Firefighters, Local 230 v. City of San Jose* (2011) 195 Cal.App.4th 1179, 1196; Code Civ. Proc., § 438, subd. (f)(2).)  We review judgments on the pleadings de novo.  (*Miller v. Campbell, Warburton, Fitzsimmons, Smith, Mendel & Pastore* (2008) 162 Cal.App.4th 1331, 1337.)  We assume the truth of all well pleaded allegations of the complaint, along with matters subject to judicial notice, and determine whether the facts alleged state a cause of action.  (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1232.)[4]

---

[4] Plaintiff argues the standard of review is the same as for a nonsuit.  The case he cites for this proposition, *Miller v. Campbell, Warburton, Fitzsimmons, Smith, Mendel & Pastore, supra,* 162 Cal.App.4th 1331, did not so hold, but properly applied the de novo standard in reviewing a motion in limine for judgment on the pleadings.  (*Id*. at pp. 1337-1338.)  Plaintiff also points out that motions in limine are a disfavored means of bringing case-dispositive statutory motions, including a motion for judgment on the pleadings (*id*. at pp. 1337-1338; *Pellegrini v. Weiss* (2008) 165 Cal.App.4th 515, 530), but here there was no prejudice.  The motion was properly decided based on the allegations of plaintiff's operative complaint.  Additionally, the trial court had inherent authority to consider the motion, even though it could have been brought earlier.  (*Coshow v. City of Escondido* (2005) 132 Cal.App.4th 687, 701-702 [court properly exercised its inherent powers over the proceedings in construing motion in limine to exclude evidence as motion for judgment on the pleadings].)

B. *Analysis*

Conversion is a strict liability tort, committed by "'the wrongful exercise of dominion over the property of another. The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages.'" (*Los Angeles Federal Credit Union v. Madatyan* (2012) 209 Cal.App.4th 1383, 1387.) No showing of knowledge, intent, negligence, or bad faith on the part of the defendant is required. Rather, conversion "'rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results.'" (*Burlesci v. Petersen* (1998) 68 Cal.App.4th 1062, 1066.)

"Contract and tort are different branches of law. Contract law exists to enforce legally binding agreements between parties; tort law is designed to vindicate social policy. [Citation.] . . . [¶] Conduct amounting to a breach of contract becomes tortious only when it also violates an independent duty arising from principles of tort law. . . . '"[A]n omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty."' [Citation.]" (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514-515; *Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 991 [the plaintiff's fraud and intentional misrepresentation claims were independent of its contract claims in part because the defendant's fraudulent conduct exposed the plaintiff to third party claims].)

Here, and as a matter of law, the Bank had no legal duty to pay plaintiff any part of the insurance proceeds it received from Federal, hold the proceeds in trust for plaintiff, or use them to rebuild and restore the building—*independent of* the Bank's duties under the lease. Plaintiff points to no authority, outside the terms of the lease, imposing any such legal duty on the Bank. Thus, the motion for judgment on the pleadings was properly granted and the conversion claim was properly dismissed.[5]

Plaintiff argues the Bank's conduct in converting the insurance proceeds for its own benefit was tortious, independent of its breach of the lease, because plaintiff alleged the Bank lied to him and caused him collateral damages, beyond its breach of the lease. Specifically, plaintiff alleged the Bank lied to him after the fire when it represented it would rebuild the building, but then terminated the lease, stopped paying rent and other charges, and delayed its receipt of the insurance proceeds from Federal until after the lease was terminated so Federal would not issue a check payable to the Bank *and* plaintiff. Plaintiff alleged he suffered emotional distress, had to borrow money at "hard

---

[5] Plaintiff points out he prevailed against the Bank's 2008 motion for summary adjudication of the conversion claim, but this is not dispositive. Though the court previously found there were triable issues on the conversion claim, the issue on the motion in limine for judgment on the pleadings was whether the claim stated a cause of action independent of plaintiff's breach of lease claim, and it did not. There is no inconsistency in the court's rulings, and even if there were, the motion for judgment on the pleadings was properly granted. (*Coshow v. City of Escondido, supra,* 132 Cal.App.4th at p. 701 [motion for judgment on pleadings properly granted even though court previously overruled moving parties' demurrers and denied their motions for summary adjudication of claims and summary judgment].)

money rates," and was forced to sell the building at a loss due to the Bank's wrongful conduct justifying an award of punitive damages.

None of these allegations state a cause of action for conversion against the Bank, independent of its breach of the lease. As explained, the Bank had no duty to plaintiff to use insurance proceeds for plaintiff's benefit, independent of its duties under the lease.

Lastly, plaintiff argues *Madatyan* favors reversal of the judgment dismissing his conversion claim. We disagree. In that case, sufficient evidence supported the trial court's ruling that an auto body shop and its owners were liable to a credit union for converting insurance proceeds in which the credit union had an equitable lien, unbeknownst to the shop or its owners. The credit union financed the purchase of a Bentley by a customer of the shop and had a lien on the Bentley. The customer purchased insurance on the Bentley, but did not name the credit union as the loss payee, contrary to the terms of the loan. (*Los Angeles Federal Credit Union v. Madatyan, supra,* 209 Cal.App.4th at pp. 1385-1387.)

After the Bentley was damaged, the customer received an insurance check payable to himself and the shop, and asked one of the shop owners to endorse the check to him. The shop owner endorsed the check, and the customer abandoned the Bentley in the shop without having it repaired. The credit union prevailed on its conversion claim against the shop and its owners, even though none of the defendants knew the credit union had an interest in the car or an equitable lien in the insurance proceeds. (*Los Angeles Federal*

29

*Credit Union v. Madatyan, supra,* 209 Cal.App.4th at pp. 1387-1388, citing *Burlesci v. Petersen, supra,* 68 Cal.App.4th at p. 1066.)

*Madatyan* is distinguishable and does not assist plaintiff's argument because there was no privity of contract between the defendants, who converted the insurance proceeds to the customer's benefit, and the plaintiff credit union which had an equitable lien in the insurance proceeds.  Thus, the plaintiff credit union's only recourse or means of recovering its equitable interest in the insurance proceeds against the shop and shop owner defendants was a suit in tort for conversion.  Here, in contrast, plaintiff had a contractual claim against the Bank for its alleged conversion of the insurance proceeds based on the lease, and the lease afforded plaintiff adequate recourse against the Bank for its alleged conversion of the insurance proceeds.

## V.  DISPOSITION

The judgment is affirmed.  The parties shall bear their respective costs on appeal. (Cal. Rules of Court, rule 8.278.)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
                                                                                          J.


We concur:

McKINSTER
          Acting P. J.

CODRINGTON
          J.

30